

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1999

# Hankins v. City of Phila.

Precedential or Non-Precedential:

Docket 98-1327

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"Hankins v. City of Phila." (1999). *1999 Decisions.* Paper 226.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/226

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1327

CECIL HANKINS,
        Appellant

v.

CITY OF PHILADELPHIA; AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES;
AMERICAN FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES DISTRICT COUNCIL 47,
LOCAL 2187

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-01449)
District Judge: Hon. Jay C. Waldman

Argued December 15, 1998

BEFORE: SLOVITER and COWEN, Circuit Judges and
OBERDORFER,* District Judge

(Filed August 18, 1999)

        Richard J. Silverberg, Esq. (Argued)
        Richard J. Silverberg & Associates
        1500 Walnut Street, Suite 900
        Philadelphia, PA 19102

         Counsel for Appellant
_____

* Honorable Louis F. Oberdorfer, U.S. District Judge for the District of
Columbia, sitting by designation.

Howard Lebofsky, Esq. (Argued)
City of Philadelphia Law Department
1515 Arch Street
One Parkway Building, 17th Floor
Philadelphia, PA 19102

 Counsel for Appellee
 City of Philadelphia

Wayne Wynn, Esq. (Argued)
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103

 Counsel for Appellees
 American Federation of State,
 County and Municipal Employees
 and American Federation of State,
 County and Municipal Employees
 District Counsel 47, Local 2187

OPINION OF THE COURT

COWEN, Circuit Judge

Cecil Hankins, an African-American and a long-time employee of the City of Philadelphia ("the City"), brought this action against the City under Title VII of the Civil Rights Action of 1964, 42 U.S.C. S 2000e et seq. ("Title VII"), the Pennsylvania Human Relations Act ("PHRA"), 42 U.S.C. S 1983, and 42 U.S.C. S 1985. Hankins also sued his union, the American Federation of State, County, and Municipal Employees, District Council 47, Local 2187 ("Local 2187" or the "Union"), under 42 U.S.C. S 1985 and state law.1 Hankins's primary allegations are that the City denied him a promotion to become the Director of its AIDS Activities Coordinating Office ("AACO Director" or"Program Director")

_____

1. Hankins originally sued both Local 2187 and it parent union, AFSCME. He has since abandoned his claims against AFSCME, however, and therefore all references in this opinion to the Union will refer only to
Local 2187.

2

because of his race, and that Local 2187 conspired with the City to deny him the position for the same illegitimate reason. The District Court granted summary judgment in favor of both defendants. The District Court also denied plaintiff's motion for sanctions against the City based on three instances of alleged misconduct by the City's counsel during the course of discovery.

We conclude that the District Court improperly resolved certain factual disputes that are central to Hankins's race discrimination claims against the City, and will therefore reverse the grant of summary judgment in the City's favor. We will affirm the District Court in all other respects.

## I. Factual Background

As this appeal arises from the grant of defendants' motion for summary judgment, we recount the facts contained in the record in a light most favorable to plaintiff, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## A. The AIDS Activities Coordinating Office

The AIDS Activities Coordination Office ("AACO") was founded in 1987 as part of the City's Department of Health. Among its responsibilities, AACO oversees AIDS prevention programs and the distribution of government funding for AIDS-related services in Philadelphia. According to David Fair, AACO's first director, the office was founded at a time of increasing tensions between AIDS advocacy groups identified with the "white, gay community" and other individuals and organizations representing ethnic and racial minorities afflicted with HIV and AIDS. 2 Although the conflict between the two sides had different dimensions, the core dispute concerned the allegation that a disproportionate percentage of the funds available for AIDS-related services were allocated to organizations affiliated with the white, gay community, despite the fact that the

_____

2. We use the phrase "white, gay community" because the record reflects its usage among the parties and the witnesses in this case, not because we necessarily share the view that there is an identifiable "community" made up exclusively of individuals who are white and gay.

3

disease was having an increasingly devastating effect on minorities.

This competition for funding fostered a politically and racially charged atmosphere surrounding the AACO and its Director. Dr. Robert Ross, the City's Health Commissioner during most of the events relevant to this lawsuit and the individual responsible for appointing the Program Director, was aware of these circumstances. According to Fair, he and Dr. Ross had several conversations concerning the growing impact that AIDS was having on minority communities. In the course of these discussions, Dr. Ross, who is an African-American, often acknowledged the strong influence that the leaders of the white, gay community had in Philadelphia political circles, including the Mayor's office.

The City had difficulty attracting and retaining qualified individuals to the AACO Directorship because, among other reasons, decisions regarding AIDS funding were widely perceived as having racial and ethnic undertones, AACO was an under-funded office and subject to intense media criticism, and there were salary constraints on the position occasioned by the City's fiscal crisis. Faced with a vacancy in the position in the Summer of 1992, Dr. Ross asked Anola Vance, an African-American woman who was then the manager of the AIDS Education and Counseling Services Division of AACO, if she would consider becoming the next Program Director. Although Vance had previously declined the position on several occasions, this time she reluctantly accepted. After submitting a civil service application that was approved by the City's personnel office, Vance was formally appointed AIDS Program Director in July 1992. Vance did not last very long, however, and within a few months she informed Dr. Ross, as well as Barry Savitz, the Deputy Health Commissioner, that she did not wish to remain in the job. While Vance agreed to remain Program Director until a suitable replacement was found, Dr. Ross and Savitz began to consider other candidates for the position.

B. Plaintiff's Employment History with the City

Cecil Hankins began working for the City in 1978 at the Department of Human Services, and subsequently held

4

various positions within the Health Department before joining AACO in 1987 as a program analyst. Approximately six months after arriving at AACO, Hankins was promoted to program analyst supervisor. Less than one year later, Hankins was asked to serve as Acting Director of AIDS Agency Services, a senior supervisory position within AACO that reported directly to the Program Director. Hankins held this position intermittently until March 1992, but ultimately did not receive a permanent appointment to the post because he did not attain a sufficiently high score on the civil service examination for the position. At Dr. Ross's direction, Hankins was eventually transferred from AACO to work at the Charles R. Drew Mental Health Center (the "Drew Center"), a private facility which the City had recently assumed operational control over. By early July 1992, Hankins was again transferred by Dr. Ross; this time to work in the Health Commissioner's office on a project related to urban violence.

Later that same month, Hankins informed Dr. Ross and Deputy Health Commissioner Estelle Richman that he intended to resign from the City. Both Dr. Ross and Richman attempted to discourage him from resigning, but Hankins would not reconsider. In his resignation letter to Dr. Ross, Hankins noted that he was leaving the City with "tremendous ambivalence," but did so to meet"unforseen challenges." Following his departure from City employment, Hankins eventually became privately employed at the Drew Center, where he remained until December 1993.

C. The Program Director Appointments

One of the individuals whom Dr. Ross and Barry Savitz considered to replace Anola Vance as AACO Director was Richard Scott, a former Health Department employee who had been on a leave of absence from the City for eight years. During that time, Scott was serving as the elected union agent for Local 2187, which is the certified collective bargaining representative for certain classes of City employees, including many employees in the Health Department. As a union agent, Scott's duties included representing the Union's membership in arbitration and grievance proceedings, as well as representing the Union at meetings of the Civil Service Commission. Dr. Ross and

5

Savitz had frequent dealings with Scott in his role as union agent and were both impressed by the manner that Scott did his job. Dr. Ross and Savitz also knew Scott as a prominent, long-time activist in the Philadelphia AIDS community. Among his other experience, Scott had served as the chairperson of the AIDS Advocacy Coalition, an organization formed during the early years of the AIDS crisis to press for greater funding for AIDS-related services. According to David Fair, Scott was widely viewed, including by Dr. Ross and Savitz, as an influential leader in the gay, white community and as someone who represented an important political constituency in the City.

At the suggestion of Savitz, Dr. Ross asked Richard Scott in the Fall of 1992 whether he would consider leaving his job as union agent for Local 2187 to become the next Program Director. At the time, Scott told Dr. Ross that family responsibilities prevented him from accepting the position. In January 1993, Dr. Ross again asked Scott if he would be interested in the AACO Directorship. This time Scott agreed to be considered. During their subsequent discussions about the position, Scott expressed concern to Dr. Ross that, under the existing civil service specifications, he did not have the requisite qualifications for the position. At the time, the civil service specifications required that the Program Director have, among other qualifications, permanent civil service status, a master's degree, and three years of so-called second-level supervisory experience directing an AIDS/HIV-related program providing services for a large government jurisdiction.[3] Although Scott did have permanent civil service status by virtue of his previous employment by the City, he did not have either of the other credentials. Despite this, Dr. Ross told Scott that he would attempt to have "the job made available to [Scott]," which Scott interpreted to mean that Dr. Ross would have the civil service specifications changed to match his qualifications.

In late January 1993, Scott informed Dr. Ross that he would accept the Program Director position. Scott terminated his employment with Local 2187 on February

---

3. "Second-level supervisory experience" refers to directing a program through subordinate supervisors.

6

15, 1993 and resumed active employment with the City the following day. Although Scott was given the title of Acting Program Director and an official civil service announcement had not yet been released, both Dr. Ross and Scott regarded the appointment as permanent.

At Dr. Ross's request, Barry Savitz worked with Joseph McNally, the Health Department's Personnel Officer, to "broaden" the eligibility criteria for the Program Director position for the specific purpose of allowing Richard Scott to qualify for the position. As a result of Savitz and McNally's efforts, new civil service specifications for the Program Director position were promulgated in January 1993. Under these new specifications, permanent civil service status was still required, but a candidate could now substitute a bachelor's degree and three years of experience administering a "national HIV/AIDS program" in place of three years of second-level supervisory experience and a master's degree. The new specifications also provided that a candidate could be eligible for the position if he or she had "[a]ny equivalent combination of education and experience determined to be acceptable by the Personnel Department," and further provided that volunteer experience could substitute for paid employment experience. As a result of these changes, Richard Scott, who held a bachelor's degree and had managed a nation-wide HIV/Prevention program on a volunteer basis for more than three years, was eligible to become Program Director. The amended specifications were approved by the Civil Service Commission at its January 1993 meeting.

At some point during the same month, Hankins, who was no longer employed by the City, learned that Anola Vance was leaving her job as Program Director. According to Hankins, he telephoned Dr. Ross to express his interest in the position. Their subsequent conversation is, in many respects, the heart of this lawsuit. According to Hankins, when he informed Dr. Ross that he would like to be considered for the Program Director position, Dr. Ross told him that the job was "reserved for the gay, white community." App. at 489. When Hankins questioned Dr. Ross about the fairness of making such a decision on the basis of race, Dr. Ross reiterated his position and further

stated that Richard Scott was the specific individual for whom the job was reserved. Id. For his part, Dr. Ross denies ever telling Hankins or anyone else that the position was reserved for someone who was white or gay, and claims that Hankins never expressed an interest in becoming Program Director.

It is undisputed, however, that Dr. Ross eventually arranged for Hankins to return to City employment on March 1, 1993, as a program analyst within the Health Department's Mental Health/Mental Retardation Unit. As a reinstated City employee, Philadelphia civil service regulations required that Hankins serve a six month probationary period before resuming permanent civil service status.

A civil service announcement for the Program Director position, reflecting the January 1993 amendments to the civil service specifications, was released in June 1993.[4] By this time, Scott had already been Acting Program Director for approximately four months. Despite the fact that Hankins had been told by Dr. Ross that the position was reserved for a member of the gay, white community, Hankins still submitted an application for the job. Richard Scott and another white City employee were the only other applicants for the position.

Mark O'Connor was the analyst in the City's Personnel Department assigned to review all applications for the Program Director position. As an employee of the Personnel Department, O'Connor did not report to Dr. Ross or anyone else from the Health Department. O'Connor's job was to evaluate the applications for the Program Director position and confirm whether the candidates possessed the requisite qualifications for the position. Upon reviewing Hankins's application, O'Connor determined that Hankins did not have the second-level supervisory experience required under the civil service specifications. Accordingly, by letter

_____

4. A civil service announcement for the Program Director position was first released in May 1993, but that announcement erroneously did not reflect the amendments to the job specifications that had been approved by the Civil Service Commission in January.

8

dated July 9, 1993, O'Connor notified plaintiff that his application had been rejected for that reason.

On July 19, 1993, Hankins submitted an amended application for the Program Director position which included additional information regarding his qualifications. That same day, however, Richard Scott was officially appointed AIDS Program Director. Approximately three months later, O'Connor notified plaintiff that his amended application for Program Director had been rejected because, notwithstanding the additional information that Hankins had provided concerning his qualifications, O'Connor still believed that Hankins did not have the experience required for the position.

On October 1, 1994, Richard Scott was removed from his position as Program Director and was reassigned to become Chief of Staff to Estelle Richman, who had previously succeeded Dr. Ross as the City's Health Commissioner. Following Scott's departure from AACO, the Program Director position remained open for nine months. During this period, Hankins again expressed his interest in the position to Richman. In July 1995, Richman selected Jesse Milan, an African-American who was then working for Temple University, to be the next Program Director. Because Milan was not a civil service employee, he was "loaned" to the City by Temple University outside of the civil service process. Milan served as Program Director until his resignation in 1997, at which time Richman appointed Patricia Bass and Joseph Croneaur interim co-directors of AACO. Like Milan, Bass and Croneaur were not City employees and were not appointed though the civil service process.

D. The Union's Involvement

In his capacity as union agent, Richard Scott was present at the January 1993 meeting of the Civil Service Commission when the Commission approved the changes to the specifications for the Program Director position. As a union agent, Scott was responsible for representing Local 2187 at such meetings on issues related to bargaining unit positions. Under the collective bargaining agreement between the City and Local 2187, however, the Program Director position was not a bargaining unit position.

9

At a general meeting of Local 2187 on June 22, 1993, a union shop steward raised the issue of whether there had been any impropriety in the Civil Service Commission's decision to amend the specifications for the Program Director position. Cathy Scott, the union agent who had succeeded Richard Scott (but is not related to him), agreed to look into the matter. Approximately two months later, Ms. Scott submitted a brief report to Local 2187's Executive Board in which she detailed the basic facts surrounding Richard Scott's appointment as Program Director. Ms. Scott did not draw any conclusions about whether there had been any impropriety concerning Richard Scott's appointment, but did request that the Executive Board advise her if it wished her to investigate further. The Executive Board did not instruct Ms. Scott to take any additional action.

In late September 1993, Hankins wrote a letter to the City's Personnel Department challenging the amendment to the civil service specifications which allowed an applicant for Program Director to substitute volunteer experience in place of paid experience. After receiving the City's response rejecting his challenge in November 1993, Hankins contacted Patricia Walton, the Union's Vice-President, for assistance as to how he should proceed in challenging Richard Scott's appointment. Walton advised plaintiff that she would look into the matter. Walton subsequently contacted Hankins sometime in January 1994 and advised him that it was too late for the Union to do anything regarding the appointment.

II. Procedural History

After obtaining a right-to-sue letter from the EEOC, Hankins filed the instant lawsuit in the District Court for the Eastern District of Pennsylvania. Hankins's central claim is that the City rejected his application to become the AIDS Program Director on the basis of his race, in violation of Title VII, the PHRA, and 42 U.S.C. S 1983. He also claims that the City illegally retaliated against him for filing this lawsuit by refusing to fill the Program Director position though the civil service process. Hankins further alleges that the City and the Union have conspired to deny him the

10

Program Director position because of his race, in violation of 42 U.S.C. S 1985(3) and state law. Finally, Hankins claims that the Union is liable for tortious interference with prospective contractual relations and fraud based on the Union's alleged inaction in assisting his challenge to the appointment of Richard Scott.

During the course of discovery, plaintiff moved for sanctions against the City based on three incidents of alleged misconduct on the part of the City's counsel. On the first occasion, plaintiff alleges that the City's counsel inappropriately communicated with Dr. Ross during a break at his deposition to coax him to change a response that was unfavorable to the City. In the second incident, plaintiff contends that the City's counsel threatened to retaliate against David Fair if he did not agree to cooperate with the City's investigation of plaintiff's complaint. Lastly, plaintiff asserts that the City's counsel and its agents, while investigating Hankins's background in his home state of South Carolina, contacted his family members under false pretenses and circulated damaging misinformation about him. The District Court denied Hankins's motion for sanctions against the City in full, determining that in all three instances cited by plaintiff, the City's counsel had not engaged in any misconduct.

The District Court granted summary judgment in favor of both defendants. Analyzing the case under the McDonnell Douglas-Burdine burden-shifting formula, the District Court concluded that Hankins could not establish a prima facie case of race discrimination against the City because he did not have the requisite qualifications to become the AIDS Program Director. Hankins v. City of Philadelphia, No. Civ. A. 95-1449, 1998 WL 175600 at *11-13 (E.D. Pa. April 9, 1998). Specifically, the District Court held that Hankins did not qualify because: (i) he did not have sufficient supervisory experience under either the original civil service specifications or the specifications as amended in January 1993; and (ii) at the time the position was filled, Hankins was a probationary City employee without permanent civil service status, which the District Court believed rendered him ineligible to become Program Director under the City's civil service regulations. Id. The District Court also

11

dismissed Hankins's retaliation claim against the City because plaintiff presented no evidence that the City's decision to hire Program Directors outside of the civil service process had any connection to the filing of the instant lawsuit. Id.

In reaching its conclusion that plaintiff's discrimination claims were not viable, the District Court found that Dr. Ross's alleged statement that the Program Director position was reserved for the gay, white community did not entitle plaintiff to a jury trial. According to the District Court, the statement was "essentially factual rather than discriminatory" because at the time Dr. Ross made the comment, he had already concluded that Richard Scott "was the best available person for the position[and] Mr. Scott was a gay white man." Id. at *13. The District Court further observed that, for a variety of reasons, it was "virtually inconceivable" that Dr. Ross would have intentionally discriminated against Hankins on the basis of race. Id.

With respect to Hankins's S 1985(3) and civil conspiracy claims against the City and the Union, the District Court held that they could not survive summary judgment because, among other reasons, there was no evidence that any Union official entered into an agreement with the City to deny Hankins an employment opportunity based on his race. Id. at *14. The Court likewise rejected Hankins's tortious interference with prospective business relations claim against the Union because Hankins could not prove that there was a reasonable probability that he would have been selected for the Program Director position if not for the allegedly wrongful conduct of the Union. Id. at *15. Finally, the District Court dismissed plaintiff's fraud claim against the Union because plaintiff "failed to produce evidence to sustain a finding of detrimental reliance on or actual damages caused by any statement or omission of the union, fraudulent or otherwise." Id. Hankins appeals.

III. Jurisdiction & Standard of Review

The District Court exercised subject matter jurisdiction pursuant to 28 U.S.C. SS 1331 and 1367. We have appellate

jurisdiction from the final order of the District Court under 28 U.S.C. S 1291.

We exercise plenary review over a grant of summary judgment, using the same standards that the District Court should have applied. Summary judgment should be granted where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 501 (3d Cir. 1996). In making its determination, the court should view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. Id. We have previously observed that this standard is applied with " `added rigor in employment discrimination cases, where intent and credibility are crucial issues.' " Steward v. Rutgers, the State University, 120 F.3d 426, 431 (3d Cir. 1997) (quoting Robinson v. PPG Indus. Inc., 23 F.3d 1159, 1162 (7th Cir.1994)).

With respect to the District Court's denial of plaintiff's motion for sanctions, our standard of review is significantly more deferential. We will reverse only if the decision constituted an abuse its discretion, which in this context would occur if the court "based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." Rogal v. American Broadcasting Companies, Inc., 74 F.3d 40, 44 (3d Cir. 1996).

IV. Claims Against the City

A. Race Discrimination Claims

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. S 2000e et seq., provides that "[i]t shall be an unlawful employment practice for an employer -- to fail or refuse to hire . . . any individual . . . because of such individual's race." 42 U.S.C. S 2000e-2(a)(1). In the employment discrimination context, this provision is generally interpreted consistently with the analogous section of the PHRA, see Gomez v. Allegheny Health Services, Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995), and with 42 U.S.C. S 1983, see McKenna v. Pacific Rail Service, 32 F.3d 820, 826 n.3 (3d Cir. 1994); cf. St. Mary's Honor

13

Center v. Hicks, 509 U.S. 502, 606 n.1 (1993) ("we shall assume that the McDonnell Douglas framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. S 1983"). Accordingly, our analysis will be the same under all three statutes.

A plaintiff can establish a discriminatory intent on the part of her employer by direct or indirect means. See Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). If, as is typically the case, the plaintiff's evidence is entirely of an indirect nature, then in order to prevail she must satisfy the familiar burden-shifting pretext framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981). The mechanics of this approach have been throughly discussed in many of our recent cases and we need not recite it in full detail here. It suffices to say that the plaintiff has the initial burden to establish a prima facie case of discrimination, the substance of which will vary depending on the type of claim; if the plaintiff is successful, the employer must then articulate a legitimate, non-discriminatory reason for the adverse employment decision; once the employer does so, the plaintiff has the burden of proving both that the employer's proffered explanation was false, "and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 512; see also Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

In those relatively infrequent instances where a plaintiff has direct evidence of discriminatory intent, the case is appropriately analyzed under the "mixed motives" analysis established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), as modified by S 107 of the Civil Rights Act of 1991, 42 U.S.C. S 2000e-2(m) (the "1991 Act").5 Under the modified Price Waterhouse standard, a defendant is liable for discrimination upon proof that a forbidden criterion (e.g., race) "was a motivating factor for any employment practice, even though

_____

5. We have held that S 107 of the 1991 Act does not apply retroactively. See Hook v. Ernst & Young, 28 F.3d 366, 373 (3d Cir. 1994). Here, however, the allegedly discriminatory action occurred in 1993 and after, placing the case within the purview of S 107.

14

other factors also motivated the practice." 42 U.S.C.
S 2000e-2(m). Where an employer proves that it would have
taken the same adverse action against a plaintiff even if it
did not consider the forbidden factor, the plaintiff will be
precluded from seeking damages or reinstatement, but may
still be entitled to declaratory relief, certain injunctive relief,
as well as attorney's fees. See 42 U.S.C.S 2000e-5(g)(2)(B);
see also Woodson v. Scott Paper Co., 109 F.3d 913, 932 (3d
Cir. 1997) (noting that under the 1991 Act, an employer no
longer has complete defense to liability, as it did under
Price Waterhouse, by showing that it would have made the
same adverse employment decision in the absence of a
discriminatory motive); Armbruster v. Unysis Corp., 32 F.3d
768, 779 n.13 (3d Cir. 1994) (same).

Hankins first contends that the District Court erred by
analyzing his discrimination claims against the City solely
under a McDonnell Douglas-Burdine pretext analysis. He
argues that Dr. Ross's comment that the Program Director
position was "reserved for the gay, white community" is
sufficiently direct evidence of a discriminatory intent to
bring his case within the realm of Price Waterhouse.6
Hankins further asserts that the District Court's
characterization of Dr. Ross's statement as "essentially
factual rather than discriminatory," and the Court's
conclusion that it is "virtually inconceivable" that Dr. Ross
would discriminate against him are irreconcilable with a
court's duty on summary judgment to interpret the record
in a light most favorable to the non-moving party.

We have consistently held that a plaintiff who contends
that he or she has direct evidence of discrimination to

_____

6. The record is not entirely clear to what extent Hankins pressed his
Price Waterhouse theory to the District Court. Waiver is not an issue
here, however, because an employment discrimination plaintiff is not
required to elect a pretext or Price Waterhouse  theory at trial.
Armbruster, 32 F.3d at 781 n.17. Instead, the District Court "must
decide whether one or both theories properly apply at some point in the
proceedings prior to instructing the jury." Id. (citing Price Waterhouse,
490 U.S. at 247 n.12.). Likewise, before granting summary judgment and
removing a case from the hands of a jury, the District Court ought to
consider whether a plaintiff's claim would survive under either a pretext
or Price Waterhouse theory.

warrant treatment under Price Waterhouse faces a heavy burden. See, e.g., Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) ("a plaintiff must clear a high hurdle to qualify for a mixed motives instruction"). Stray remarks in the workplace, statements by non-decisionmakers, or even statements by decisionmakers unrelated to the decisional process itself, will not suffice to trigger a Price Waterhouse analysis. See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 (3d Cir. 1995) (quoting Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)). Instead, the plaintiff must be able to point to " `conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting a discriminatory attitude." Starceski, 54 F.3d at 1096 (quoting Miller v. CIGNA Corp ., 47 F.3d 586 (3d Cir. 1995) (en banc)); see also Armbruster, 32 F.3d at 778.

Although this standard is a stringent one, we agree with Hankins that Dr. Ross's statement, if made, would constitute direct evidence of discrimination. In stating that the AACO Director position was "reserved for the gay, white community," Dr. Ross in effect told Hankins that he was disqualified from contention because he is black. In our view, this would be a quintessential example of direct evidence. See Venters, 123 F.3d at 973 ("The most obvious and compelling example [of direct proof of discrimination] would be a remark to the effect that `I won't hire you because you are a woman' or `I'm firing you because you're not a Christian.' "). Indeed, we would be hard pressed to conceive of a statement that is more revealing of a discriminatory attitude than the one plaintiff attributes to Dr. Ross.

As mentioned, the District Court concluded that Dr. Ross's comment was not significant because the statement was "essentially factual rather than discriminatory." Hankins, 1998 WL 175600 at *13. Apparently, the Court believed that the comment merely reflected the fact that Dr. Ross had already decided by the time he spoke with Hankins that Richard Scott -- who just happened to be white and gay -- was the best available person for the job. Id. There are two major problems with this view. The first

16

is that it represents a rather conspicuous failure on the part of the District Court to consider the evidence in a light most favorable to plaintiff, the party responding to the City's motion for summary judgment. Although the City may certainly argue at trial that Dr. Ross's comment revealed no discriminatory intent on his part, it is manifest that a reasonable jury could reject such a selective interpretation of the comment and instead decide that the statement reflected Dr. Ross's intention to exclude all non-white candidates from being considered for the Program Director position.

The second flaw in the District Court's interpretation, closely-related to the first, is that it has little, if any, support in the record. The City has not suggested at any point in this litigation that Dr. Ross uttered the comment that plaintiff attributes to him, but that the statement demonstrates no discriminatory intent. To the contrary, and as the District Court recognized in its decision, the City's litigation position is that Dr. Ross never made the statement in the first place. At his deposition, Dr. Ross so testified. Thus, we are presented with an oath against oath situation: plaintiff swears that Dr. Ross told him that the Program Director position was set aside for a white person, and Dr. Ross swears that he said no such thing. It is axiomatic that the finder of fact must resolve such conflicts in testimony, not a court making a judgment as a matter of law. See, e.g., Boyle v. County of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) ("[A]t the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder.") (citation omitted).

The District Court apparently discounted the significance of Dr. Ross's alleged statement because, in part, the Court found it "virtually inconceivable that [Dr. Ross] would intentionally discriminate against plaintiff because he is black." Hankins, 1998 WL 175600 at *13. This was so, according to the District Court, because: (i) Dr. Ross had given plaintiff favorable treatment in the past, including counseling him not to resign from the City and re-hiring him after his resignation; (ii) Dr. Ross had previously appointed Anola Vance, a black person, to become AACO

17

Director and had allegedly sought the application of other minority candidates before selecting Richard Scott; and (iii) Dr. Ross is himself an African-American. Id. We concede that these arguments are all valid ones for the City to raise in attempting to convince a trier of fact that plaintiff was not the victim of intentional discrimination. Still, we cannot agree that any of these points, assessed individually or cumulatively, compels the conclusion that the City is entitled to judgment as a matter of law.

We find especially troublesome the District Court's implication that because Dr. Ross is black, he would not have intentionally discriminated against another African-American. The Supreme Court has long counseled against such reasoning, explaining that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." Castenda v. Partida, 430 U.S. 482, 499 (1977); see also Onacle v. Sundowner Offshore Services, Inc., 118 S. Ct. 998, 1001 (1998). The evidence here, when viewed in a light most favorable to plaintiff, demonstrates precisely why such a presumption is unwarranted. Plaintiff's theory of the case is not that he was the victim of racial animus or hatred on the part of the City or its officials, but instead that he was not permitted to compete for the Program Director position because of racial politics. Specifically, plaintiff contends that, as a result of the substantial political influence of AIDS advocacy organizations affiliated with the white, gay community, Dr. Ross was under pressure to select someone who was both white and gay to become the next Program Director. In support of his claim, plaintiff points not only to Dr. Ross's comment, but also to, inter alia, the testimony of David Fair, the former AACO Director who confirmed the racial and political tensions surrounding the AACO and its work, as well as Dr. Ross's awareness of such matters and Richard Scott's reputation as a leader of the gay, white community. Considering this evidence, we are unwilling to say as a matter of law that because Dr. Ross may have treated plaintiff well in the past (a proposition that itself is subject to conflicting testimony), that he had previously hired an African-American to become Program Director, and that Dr. Ross is himself black, it is therefore impossible

18

that race was a motivating factor in Dr. Ross's decision to hire Richard Scott instead of plaintiff.

The City argues that we should ascribe no significance to Dr. Ross's statement because, even assuming that he had a discriminatory intent, he was not the relevant decisionmaker. According to the City, the record is undisputed that Mark O'Connor, the City personnel analyst who reviewed plaintiff's application, independently and without instruction from Dr. Ross or anyone else determined that plaintiff did not have the requisite experience to become Program Director. We reject the argument. There is overwhelming evidence in the record that Dr. Ross, the Health Commissioner, had the authority to select the Program Director. Indeed, Dr. Ross himself testified that he selected Richard Scott to become Program Director in February 1993, over three months before Mark O'Connor ever even reviewed plaintiff's application for the position. Moreover, at the time he made the selection, both Dr. Ross and Richard Scott considered the appointment permanent, notwithstanding the fact that the civil service process for filling the position had not even been initiated. Based on this evidence, a reasonable jury could determine that Dr. Ross was the relevant decisionmaker, and that Mark O'Connor's review and rejection of plaintiff's application in June 1993, as well as the entire civil service process for filing the Program Director position, was merely an after-the-fact formality. We therefore find that plaintiff has presented sufficient evidence "to permit the factfinder to infer that [a discriminatory] attitude was more likely than not a motivating factor in the employer's decision" to reject plaintiff's application to become Program Director. Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997) (internal quotation omitted).

The City argues that, notwithstanding this conclusion, the District Court's decision to grant summary judgment on plaintiff's race discrimination claims should still be affirmed because the undisputed evidence in the record is that plaintiff did not have the requisite qualifications to become Program Director. The City contends, and the District Court agreed, that plaintiff was ineligible to become Program Director because he lacked the experienced required under

19

the civil service specifications (either the original specifications or the specifications as amended in January 1993), and because he lacked permanent civil service status when Richard Scott was officially appointed in July 1993. We disagree with the City and hold that there are substantial and material factual disputes concerning whether plaintiff had the necessary qualifications to become Program Director.

The District Court accepted the City's argument that Hankins could not have been appointed Program Director because he did not have the supervisory experience required under either set of civil service specifications. The parties hotly contest this issue in their briefs; plaintiff insists that he was qualified under either set of civil service specifications, and the City, relying on Mark O'Connor's evaluation of plaintiff's application, argues with equal vigor to the contrary. We believe it unnecessary to decide who has the best of this fight because it is premised on an assumption that could be rejected by the trier of fact; namely, that the civil service specifications did in fact represent the essential qualifications for the Program Director position. The City has admitted that, at the direction of Dr. Ross, the specifications were broadened in several respects to permit Richard Scott to qualify for the position. It is also not disputed that had the specifications not been changed, Richard Scott would not have been eligible. A reasonable jury could properly infer from these facts that had Dr. Ross been inclined to select plaintiff to become Program Director instead of Scott, the City would have amended the civil service specifications in such a manner to allow Hankins, not Scott, to become eligible. Having adjusted the civil service specifications to allow Richard Scott to qualify for the position, we think it somewhat disingenuous for the City now to argue that those same specifications represented an immovable, impenetrable bar to plaintiff's application. In any event, this is surely an issue for the jury to resolve.

The City's final argument is that plaintiff was ineligible to become Program Director because, at the time Richard Scott was officially appointed to the position on July 19, 1993, plaintiff was a probationary employee without

permanent civil service status.7 The City contends, and the District Court once again agreed, that the City's civil service law prohibits the promotion of an employee who does not have permanent civil service status and, therefore, plaintiff could not have been appointed Program Director notwithstanding any discriminatory intention on the part of Dr. Ross. Plaintiff does not dispute that, at the time of Richard Scott's appointment, he did not have permanent civil service status. He argues instead that the civil service regulations allow someone who was in his position-- a former permanent civil service employee who had previously resigned from the City and was then serving a probationary period following reinstatement -- to be eligible for a promotion. He refers us to Philadelphia Civil Service Regulation S 9.026, which is captioned "Scope Of Promotion Competition" and provides as follows:

> Competition in any promotional examination shall be open to employees with permanent Civil Service status in such classes and in such departments as the Director in his discretion shall determine. Employees serving in a probationary period as a result of reinstatement following previous service with permanent status may also be admitted, provided however, that such reinstated employees may not be certified for appointment until the probationary period has been completed.

App. at 172 (emphasis added).

The parties have not cited any judicial interpretations of this provision by the Pennsylvania state courts, but we agree with plaintiff that its plain meaning allows an employee serving a probationary period following reinstatement to be eligible for promotion, and that the regulation merely prohibits such employees from being officially certified until after the probationary period is completed. Indeed, the City conceded this at oral argument.

_____

7. Plaintiff was on probation because he had resigned from the City and had been reinstated within one year. Under these circumstances, Philadelphia civil service regulations required that he serve a six month probationary period before resuming permanent civil service status. See Phil. Civil Service Regulations SS 14.02 and 15.031, App. at 189-191.

21

The City counters that, notwithstanding the permissive language of the regulation with respect to reinstated civil service employees, it has been the consistent policy and practice of the City's Personnel Department that individuals may not be promoted unless they have permanent civil service status within thirty days of the last date that applications for the position are accepted. In support of this, the City relies on an affidavit from the City's Personnel Director, which states as much. We believe, however, that the regulation itself, which carries the force of law, see Walls v. City of Philadelphia, 646 A.2d 592, 595 (Pa. Commmw. Ct.1994), and which clearly allows for a reinstated probationary employee to be considered for a promotion subject to final certification, must take precedence over a purported policy and practice that is apparently inconsistent with the regulation. Although our dissenting colleague apparently disagrees with this conclusion, she does not contest that, under the reinstated employee provision of Regulation 9.026, Hankins was eligible for a promotion.

In any event, the City's contention that permanent civil service status was an essential, non-negotiable requirement for the Program Director position is belied by the record of this case. Since Richard Scott vacated the post in 1994, three individuals -- Jesse Milan, Patricia Bass, and Joseph Croneaur -- have served as Program Director (the latter two as co-Program Directors), but none had permanent civil service status at the time of his or her appointment. Given this evidence, we are mystified by the dissent's repeated assertion that there is a "lack of any evidence in the record that the City had ever discarded" the permanent civil service requirement. Dissent at 33; see also id. at 33 (referring to the "consistently applied prerequisite of permanent civil service status"). We conclude that, at a minimum, there are triable issues of fact as to whether Hankins's lack of permanent civil service status rendered him unqualified to become Program Director.8

(Text continues on page 25)

---

8. The dissent contends that the City was properly awarded summary judgment on plaintiff's failure to promote claims because: (i) Hankins

22

was purportedly unqualified as a matter of law to become Program
Director, see dissent at 31-33, and (ii) an unqualified plaintiff cannot
under any circumstances maintain a cause of action for disparate
treatment, even where he has produced direct evidence that race was in
fact a motivating factor in an adverse employment decision, id. at 34-38.
For the reasons stated in the text, we respectfully disagree with the
first
half of the dissent's argument (concerning Hankins's qualifications), and
thus have no occasion to decide the merits of the second.

Because the issue may arise in a future case, however, Judge Cowen
notes his own disagreement with the dissent's interpretation of the Civil
Rights Act of 1991. In Price Waterhouse, 490 U.S. 228 (1989), the
Supreme Court held that when a disparate treatment plaintiff has proved
that a forbidden criterion was a motivating factor in an employment
action, "an employer shall not be liable if it can prove that, even if it
had
not taken [the forbidden criterion] into account, it would have come to
the same decision." Id. at 242. Congress believed that this holding
"severely undercut" the effectiveness of Title VII. H.R. Rep. 102-40(I) at
45, reprinted in 1991 U.S.C.C.A.N. at 583. The House Report explained:

>        The Court's holding in Price Waterhouse severely undermines
>        protections against intentional employment discrimination by
>        allowing such discrimination to escape sanction completely under
>        Title VII. Under this holding, even if a court finds that a Title
VII
>        defendant has clearly engaged in intentional discrimination, that
>        court is powerless to end that abuse if the particular plaintiff
who
>        brought the case would have suffered the disputed employment
>        action for some alternative, legitimate reason.

H.R. Rep. No. 102-40-(II) at 18, reprinted in  1991 U.S.C.A.A.N. at 711.

Accordingly, under the 1991 Act, "an unlawful employment practice is
established when the complaining party demonstrates that race, color,
religion, sex, or national origin was a motivating factor for any
employment practice, even though other factors also motivated the
practice." 42 U.S.C. S 2000e-2(m). In a departure from Price Waterhouse,
however, the 1991 Act also provides that when an employer proves that
it would have taken the same action in the absence of discrimination, a
plaintiff can still recover attorney's fees, costs, declaratory relief,
and
limited injunctive relief, 42 U.S.C. S 20005(g)(2)(B)(i), although he will
not
be entitled to damages, promotion, or reinstatement. 42 U.S.C.
S 20005(g)(2)(B)(ii).

In Judge Cowen's view, these provisions make it clear that a plaintiff
who produces direct evidence that discriminatory animus was a
motivating factor in an adverse employment decision is entitled to

survive summary judgment even when an employer can establish as a matter of law that the plaintiff would have been subject to the same

23

employment decision in the absence of discrimination. As the Seventh Circuit has explained:

> The upshot of these provisions is that once the plaintiff has presented evidence reasonably suggesting that her race, sex, religion, or national origin played a motivating role in her discharge, summary judgment will rarely (if ever) be appropriate; for even if the employer can eliminate all doubt at that point as to whether it would have taken the same action without considering the proscribed criterion, the plaintiff still might obtain limited relief.

Venters v. City of Delphi, 123 F.3d 956, 973 n.7 (7th Cir. 1997).

Applying this rule to the instant case, Judge Cowen believes that, even if the City could demonstrate that Hankins would not have been appointed Program Director because of his lacking credentials, based on the direct evidence of Dr. Ross's discriminatory intent, a factual dispute would still remain as to whether Hankins's race was, in actuality, a motivating factor in the City's decision not to appoint him. If a jury decided that it was, in Judge Cowen's view, Hankins would still be entitled to "declaratory relief, injunctive relief . . . and attorney's fees and costs directly attributable . . . to the pursuit of [the] claim," although he would not be entitled to damages, promotion, or payment. 42 U.S.C. S 2000e-5(g)(2)(B).

Judge Cowen observes that the dissent avoids this result by reading a "qualifications exception" into S 2000e-2(m) and S 2000e-5(g)(2)(B). According to the dissent, even though the 1991 Act provides without exception that an illegal employment practice is established upon proof that "discrimination was a motivating factor in an adverse employment action, " S 2000e-2(m), and that an employer may only limit the remedies available to a plaintiff by showing that it would have taken the same adverse employment action in the absence of a discriminatory motive, Congress actually intended to deny any cause of action altogether to a plaintiff who is not qualified for a given position. This is true, according to the dissent, even when that plaintiff has direct proof that an adverse employment decision was in fact motivated by invidious discrimination and not by the lack of qualifications. Thus, in the dissent's view, a hypothetical minority job applicant who is told point-blank at an interview that he is being denied the position because of his race is entitled to no relief whatsoever, not even a declaratory order from a court prohibiting that employer from considering race in future employment decisions, so long as the employer is able to establish, well after the fact, that the applicant would not have received the position in any event

because he lacked a particular job qualification. On the other hand, according to the dissent, the same minority applicant with direct evidence of discrimination would presumably be entitled to the limited relief provided for in S 2000e-5(g)(2)(B) if the employer demonstrated that

24

Accordingly, for the foregoing reasons, the District Court erred in awarding summary judgment to the City on plaintiff's race discrimination claims.9

B. Retaliation Claim

Plaintiff next argues that the District Court erred in granting summary judgment to the City on his retaliation claim. Under Title VII, it is illegal for an employer to discriminate against an employee because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. S 2000e-3(a). To establish a prima facie case of retaliation under a pretext theory, a plaintiff must show that (1) he was engaged in protected activity; (2) he was subject to an adverse employment action subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the adverse action. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). If the plaintiff succeeds, the production burden shifts to a defendant to advance a legitimate, non-retaliatory reason for its employment decision. Id. at 920 n.2. "The defendant's burden at this stage is relatively light: it is satisfied if the defendant articulated any legitimate reason" for the adverse decision. Id. If the defendant satisfies its burden of production, the presumption of discrimination drops from the case; to prevail, the plaintiff must be able to demonstrate that defendant's proffered reason is false and that discrimination was the real reason. Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 512 (1993)).

Plaintiff contends that a reasonable jury could conclude

_____

the applicant would not have received the job for some legitimate reason unrelated to his qualifications. Judge Cowen believes that such a view is inconsistent with the plain meaning of the 1991 Act and the intent of Congress as demonstrated in the above quoted legislative history.

9. Because we conclude that, under a modified Price Waterhouse analysis, plaintiff is entitled to a jury trial, we need not address his alternative argument that he has made a sufficient showing to survive summary judgment under the McDonnell Douglas pretext formula. Of course, this does not preclude plaintiff from pursuing a pretext theory at trial. See Armbruster, 32 F.3d at 781 n.17; see also supra note 6.

that the City has decided that it will not promote any Civil Service employee -- including himself -- to become Program Director while this litigation is pending. He points to the fact that since Richard Scott was removed as Program Director, Jesse Milan, Patricia Bass, and Joseph Croneaur were all appointed to the position outside of the civil service process, despite plaintiff's expressed interest in the position.

We will assume arguendo that this minimal showing satisfies the requirements of a prima facie case of retaliation. But in response, Estelle Richman, the Health Commissioner who appointed Milan, Bass and Croneaur, has testified that she sought to appoint individuals to the Program Director position outside of the civil service process not to retaliate against plaintiff, but because, before committing to a permanent civil service appointment, she wanted to understand why the AACO was, in her view, a dysfunctional agency. This explanation, which is legitimate and non-retaliatory, satisfied the City's burden of production. Plaintiff, in turn, has not pointed to any evidence from which a fact finder could conclude that Richman's reason is untrue or is otherwise a pretext for discrimination.10 He is therefore not entitled to proceed on this cause of action. We will affirm the District Court's grant of summary judgment to the City on plaintiff's retaliation claim.

V. Conspiracy Claims

Hankins next argues that he is entitled to a jury trial on his claim that the Union and the City conspired to deprive him of the Program Director position because of his race, in violation of 42 U.S.C. S 1985(3) and state conspiracy law.11

_____

10. Plaintiff contends that the City's Personnel Director, Linda Seyda, admitted at her deposition that the City has a policy of not filling positions that are the subject of pending litigation. Our review of her testimony, however, indicates that she did not so testify.

11. 42 U.S.C. S 1985(3) prohibits a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of
the equal protection of the laws, or of equal privileges and immunities under the laws...."

26

To maintain a claim under 42 U.S.C. S 1985(3), a plaintiff must establish: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons ... [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997).

The conspiracy that plaintiff alleges between the City and the Union is based on an alleged agreement between Richard Scott, an employee of the Union, and Dr. Ross, the City's Health Commissioner, to place Scott in the Program Director position because of Scott's race. The record is undisputed, however, that no Union official was aware that Scott was planning to accept the position until after he had already done so. In the absence of such knowledge on the part of a Union official, a reasonable jury could not find that Scott was acting as an agent of the Union in accepting the Program Director position and resigning from the Union. Therefore, plaintiff has failed to prove the existence of a conspiracy between the Union and the City, an essential element of his S 1985(3) claim.

Hankins's S 1985(3) claim also fails because there is no evidence that anyone affiliated with the Union, including Scott, sought to deny him the Program Director position because of his race. Even if plaintiff could demonstrate that Scott was acting on behalf of the Union in accepting the Program Director position, Hankins has failed to show that Scott did so with any intention of discriminating against him. While a jury might find that Dr. Ross harbored an improper motive in appointing Scott to the position, there is no evidence that Scott shared that intention. Accordingly, defendants are entitled to summary judgment on plaintiff's S 1985(3) conspiracy claims.12

_____

12. The parties have analyzed plaintiff's state law civil conspiracy claim and his S 1985(3) claim under the same standards. Accordingly, we will affirm the grant of summary judgment to the defendants on the state law civil conspiracy claim as well.

27

VI. Remaining Claims

Plaintiff also presses his claim against the Union for intentional interference with prospective contractual relations. He maintains that had the Union not remained silent while the City amended the civil service specifications for the Program Director position, he would have been appointed to the job.

Under Pennsylvania law, to establish intentional interference with prospective contractual relations, a plaintiff must prove: "(1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) The absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendants' conduct; and (5) . . . a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." Brokerage Concepts, Inc. v. U.S. Healthcare, 140 F.3d 494, 530 (3d Cir. 1998) (citing Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988)).

The Union argues, and the District Court found, that plaintiff failed to establish that there is reasonable likelihood that he would have been appointed Program Director but for the purported interference of the Union. We agree. Viewing the evidence in a light most favorable to plaintiff, a reasonable jury could not find that had the Union objected to the amendments of the civil service specifications, there is a reasonable probability that Hankins would have been selected Program Director. As plaintiff concedes, Program Director was not one of the positions covered by the collective bargaining agreement between the City and the Union. Therefore, the Union would not have had standing to object to an amendment of the Program Director civil service specifications. Plaintiff nonetheless insists that the Union had the authority to object to any change in the civil service specifications that affected its members; he cites Cathy Scott's preliminary investigation into Richard Scott's appointment as evidence of this fact. Even if plaintiff is correct, however, a fact finder

28

would be engaging in speculation to assume that the City would not have amended the specifications if the Union had lodged an objection related to a non-bargaining unit position.

Furthermore, even if the Union could have prevented the City from amending the specifications, it does not then follow that there is a reasonable likelihood that plaintiff would have been appointed Program Director. Although Richard Scott may not have been selected if the specifications were left unaltered, there is no way of knowing who would have been appointed in his place. Accordingly, plaintiff's intentional interference with prospective business relations claim against the Union must fail.

Plaintiff's fraudulent misrepresentation claim against the Union is also deficient.[13] He alleges that Patricia Walden, on behalf of the Union, committed fraud by assuring him that the Union would investigate Richard Scott's appointment as Program Director and then informing him approximately two months later that it was too late for the Union to take any action. Plaintiff has made no showing, however, that Walden acted with an intent to defraud or that any statement that she made proximately caused an injury that he suffered. We will therefore affirm the District Court on this count as well.

VII. Motions for Sanctions

Finally, plaintiff has appealed the District Court's denial of his motion for sanctions against the City. With respect to the three incidents of alleged misconduct cited by plaintiff, the District Court found that the City's counsel did not improperly attempt to influence Dr. Ross during his deposition, that David Fair was not threatened with

_____

13. To sustain his fraud claim, plaintiff must prove by clear and convincing evidence that (i) the defendant fraudulently made a misrepresentation with an intent to induce plaintiff to act thereon; (ii) that plaintiff justifiably relied on the misrepresentation; and (iii) that he
sustained actual damages as a proximate result. See Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 731 (3d Cir. 1991).

29

retaliation by the City's counsel, and that the City's counsel did not act improperly in investigating plaintiff's background in South Carolina. Having thoroughly reviewed the record related to each of these incidents, we cannot conclude that the District Court's factual findings are clearly erroneous or that its refusal to impose sanctions was otherwise an abuse of discretion. Accordingly, we will affirm the District Court's order denying plaintiff's motion for sanctions.

VIII. Conclusion

For the foregoing reasons, we will reverse the District Court's grant of summary judgment to the City on plaintiff's race discrimination claims, but will affirm the judgment in favor of the City on plaintiff's retaliation, S 1985(3), and state law conspiracy claims. We will also affirm in all respects the District Court's grant of summary judgment to the Union, as well as the District Court's denial of plaintiff's motion for sanctions against the City.

Each party to bear its own costs.

30

SLOVITER, Circuit Judge, dissenting.

I agree with the majority that, viewing the record in the light most favorable to plaintiff as we are required to for purposes of summary judgment, we must regard the statement allegedly made by Dr. Ross as direct evidence of discriminatory animus. I part from the majority, however, because I believe the majority has erred in disregarding the significance of Hankins' failure to meet one of the objective minimum qualifications for the job he sought.

The key to the District Court's grant of summary judgment was its determination that Hankins had not produced evidence to show that he was qualified for the position of Director of the AIDS Activities Coordination Office ("AAOC") (referred to by the District Court as "Program Director"). The majority holds that"there are substantial and material factual disputes concerning whether plaintiff had the necessary qualifications to become Program Director," Maj. Op. at 20, a conclusion with which I disagree.

I would uphold the District Court's conclusion that Hankins "plainly lacked the qualifications for the position," Hankins v. City of Philadelphia, Civil Action No. 95-1449, slip op. at 28 (E.D. Pa. 1998), because it was based on uncontroverted evidence in the record (1) that one of "the primary requirement[s] of both [the] Promotional Opportunity Announcements [was] that the applicant have permanent Civil Service status within thirty days of the closing date of the announcement," id. at 24-25, and (2) that Hankins "did not and within thirty days could not have permanent Civil Service status," id. at 28. The applicable Civil Service regulation, Regulation 9.026, made promotion open "to employees with permanent Civil Service status." Hankins conceded that he lacked such status at the relevant time. For me, that is dispositive.

Undaunted by these plain facts, Hankins made several arguments why he should nevertheless have been appointed Program Director. First, Hankins argued that he could have taken the examination for Program Director while on probationary status and the City could have either temporarily appointed him or waited to appoint him until

31

after he achieved permanent status. Second, Hankins argued that, as a reinstated employee, he should have been deemed eligible to take the examination for Program Director when the position was posted and then "certified" when he achieved permanent Civil Service status on September 1, 1993. Finally, Hankins argued that the City routinely manipulated the Civil Service regulations and should not be permitted to shield behind them.

The City was not required to excuse Hankins from the qualifications for Program Director unless it would ordinarily have excused other candidates from these qualifications under similar circumstances. As the District Court concluded, Hankins failed to present any competent evidence to suggest that the City would have excused other candidates from the permanent Civil Service status requirement. Hankins contends that the City frequently holds positions open or crafts temporary appointments to allow a candidate to achieve permanent Civil Service status, but he did not submit any evidence to support this contention.

Moreover, the Personnel Director of the City testified that it is consistent City policy and practice not to appoint persons if they do not have permanent Civil Service status and that individuals may not compete unless they meet the qualifications within 30 days of the closing date for applications, which Hankins was unable to do because the closing date for the position was June 30, 1993, and Hankins' probationary period ended August 31, 1993. The District Court also found that Hankins "present[ed] . . . no competent evidence to substantiate his . . . accusation that the City routinely manipulates Civil Service Regulations to achieve illicit goals." Id. at 26. This is enough to support the District Court's grant of summary judgment, without considering the City's contention that Hankins also lacked the necessary experience.

The majority reasons that because the Civil Service specifications "were broadened in several respects to permit Richard Scott to qualify for the position," a jury could infer that had the City wanted to select Hankins, it "would have amended the civil service specifications in such a manner to allow Hankins, not Scott, to become eligible." Maj. Op. at

32

20. The weak spot in the majority's "amend at will" approach is the lack of any evidence in the record that the City had ever discarded the requirement that the applicant have permanent Civil Service status,[14] a requirement that Hankins did not satisfy at the time in question.

Hankins does not suggest that Scott lacked permanent Civil Service status, and the majority acknowledges that Scott had that status. Maj. Op. at 8. The changes in job qualifications that were made to enable Scott to qualify permitted a candidate to substitute a bachelor's degree and three years of experience administering a "national HIV/AIDS program" for the requirement of a master's degree and three years of second-level supervisory experience. The City's willingness to permit candidates to substitute what appears to be an equivalent experience to meet this requirement does not support the majority's conclusion that the City was flexible at will about the requirement of permanent Civil Service status.

Moreover, the changes in job description requirements were not made at the will of the personnel department. Instead the substitutions had to be and were approved by the Civil Service Commission before they were made and before Scott resumed his employment with the City. Hankins offered no evidence to suggest that the Civil Service Commission would revise or delete the consistently applied prerequisite of permanent Civil Service status. In contrast, the City offered evidence that it had never done so. I would therefore uphold the District Court's decision to grant summary judgment on the issue of Hankins' qualifications.

One of the prerequisites of a plaintiff's Title VII case based on disparate treatment is a showing that plaintiff

_____

14. There is no reason for the majority to be mystified by this assertion. Because of the pendency of this lawsuit, the City was understandably reluctant to find a permanent replacement. Jesse Milan was never employed by the City, having been on loan from Temple University. The other two individuals referred to by the majority, Patricia Bass and Joseph Cronauer, were hired on a contract basis. None of these individuals were hired at time Hankins had applied or Scott had been given the position.

was qualified for the position at issue, irrespective of which of the two different types of disparate treatment cases plaintiff falls within: the McDonnell Douglas-Burdine or pretext cases on the one hand or the Price Waterhouse or "mixed-motives" cases on the other. "[W]hether a plaintiff has presented a pretext or a mixed-motives case depends on the quality of the evidence that the plaintiff adduces in support of the claim of illegal discrimination." Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997). For a case to be treated as a mixed-motives case, "the evidence must be such that it demonstrates that the `decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' " Id.

Qualification for the position at issue is unquestionably one of the elements of a prima facie case for employment discrimination under the McDonnell Douglas-Burdine line of cases. See, e.g., Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). "The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove . . . that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Id. at 253 (emphasis added).

I believe that a plaintiff is required to show at least as much to shift the burden of proof to the defendant under the Price Waterhouse line of cases. We have described the showing that a Price Waterhouse plaintiff must make as "a high hurdle," Walden, 126 F.3d at 513, and remarked that such a plaintiff "must produce . . . more direct evidence than is required for the McDonnell Douglas/Burdine prima facie case," Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 n.4 (3d Cir. 1995). Although this language, reasonably construed, requires the plaintiff in a Price Waterhouse case to satisfy the additional requirement of submitting direct evidence of discriminatory animus, it does not mean that the plaintiff in such a case is excused from the McDonnell Douglas-Burdine requirement that she prove that she was a qualified candidate. As noted above, the Supreme Court has commented that this burden is "not onerous."

34

I note that there is nothing in the 1991 amendments to Title VII, embodied in the Civil Rights Act of 1991, that suggests that a Price Waterhouse plaintiff need not be an objectively qualified candidate to survive summary judgment.

The 1991 Act arose from efforts to overturn the result of several Supreme Court decisions that members of Congress believed were inconsistent with Title VII's goal of eradicating discrimination. One of the decisions explicitly targeted was Price Waterhouse.15 In that case, a woman whose candidacy for partnership in an accounting firm had been placed on hold sued under Title VII and produced evidence showing that reviews from male partners containing sex stereotypical judgments had played a role in that decision; her employer produced evidence showing that she would have been denied that partnership even in the absence of discrimination.

The Supreme Court, in a plurality decision, held that "when a plaintiff . . . proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability . . . by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." 490 U.S. at 258. The Supreme Court's decision thus concerned the elements of a defendant's affirmative defense of mixed motives rather than the elements that a plaintiff must prove as part of her initial showing before the burden is shifted to the defendant, the issue facing this court here. Its discussion assumed that the plaintiff had already both proven the equivalent of a prima facie case under McDonnell Douglas and Burdine, presumably including objective qualification, and submitted direct evidence of discrimination.

_____

15. Another decision targeted, Wards Cove v. Antonio, 490 U.S. 642 (1989), was viewed as retreating from the disparate impact decision in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and Albermarle Paper Co. v. Moody, 422 U.S. 405 (1975), by placing the burden on the plaintiff to demonstrate which criteria within a multi-factor employment practice have a disparate impact. Section 105 of the 1991 Act sought to restore the business necessity defense to its pre-Wards Cove status by amending 42 U.S.C. S 2000e-2.

35

The House Report which constitutes the legislative history of the 1991 Act, H.R. Rep. No. 102-40(I) (1991), reprinted in 1991 U.S.C.C.A.N. 549, confirms that Congress, too, was concerned with the defendant's affirmative defense, not the plaintiff's initial burden of proof. The Report opined that the inevitable result of the Price Waterhouse decision would be to permit employment discrimination prohibited under Title VII to escape sanction. Id. at 584. In response, Congress enacted the first of the 1991 amendments relevant here which added to the earlier statutory provision making it an unlawful employment practice to reach decisions based on race or one of the other prohibited considerations the language "even though other factors also motivated the practice." 42 U.S.C. S 2000e-2(m).

The House Report also expressed disapproval of the lack of a remedy in a mixed motive case. It noted that, because of the Price Waterhouse decision, an employer whose employment decision was motivated in part but not exclusively by an illegitimate consideration could not even be enjoined from utilizing the same illegitimate consideration in future decisions. See id. at 585 (citing as illustrative EEOC v. Alton Packaging Corp., 901 F.2d 920 (11th Cir. 1990)). This led to the second amendment, which amended the remedy provision of the statute to provide that if an impermissible consideration was a motivating factor in the employment decision, the plaintiff could still be entitled to "declaratory relief, injunctive relief . . . and attorney's fees and costs demonstrated to be directly attributable . . . only to the pursuit of a [Title VII] claim," but not damages. 42 U.S.C. S 2000e-5(g).

In its discussion of the necessity of these amendments, the House Report assumes that plaintiff has already met her burden of proof, which I believe includes a showing that she possessed the objective minimum qualifications for employment in the position she sought. Nothing in the House Report suggests that the two amendments directed to the Price Waterhouse decision were meant to relieve plaintiff of the burden of showing that she possessed those objective qualifications, a burden established by the Supreme Court prior to Price Waterhouse. To the contrary,

36

Congress defined its intent in adopting the 1991 legislation as "to restore Title VII's comprehensive ban on all impermissible considerations of race, color, religion, sex or national origin in employment." Id. at 585-86 (first emphasis added).

It follows that a plaintiff who patently failed to show that s/he has the minimum qualifications for the position could not proceed to trial on a Title VII claim either before or after the Civil Rights Act of 1991. My colleague Judge Cowen spins an unrealistic hypothetical web (i.e. a "minority job applicant who is told point blank at an interview that he is being denied the position because of his race") in an attempt to show that an applicant who patently was lacking the essential objective qualifications needed for the position at issue can nonetheless proceed to trial because of that Act. I do not agree.

The case Judge Cowen cites, Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997), makes no reference to the plaintiff's objective qualifications or lack thereof. Instead, in Venters the defendant countered plaintiff's claim that she was terminated on account of her religion in violation of Title VII by attempting to show that it was plaintiff's performance, which the defendant claimed was deficient, that led to her termination. Id. at 964. Venters illustrates the paradigmatic mixed-motive case to which the amendments apply -- where each party offers a subjective reason for the employment decision -- one legitimate and one discriminatory. In such cases, the parties typically do not contest whether plaintiff meets the objective minimum requirements for employment in the position.

The weakness of Judge Cowen's position is further illustrated by a not unrealistic hypothetical. Assume that applicable state law requires that all law enforcement officers be at least 21 years of age. May an 18-year old female applicant, whose application for employment with a township police department was denied, proceed to trial on the strength of evidence that the Township Police Chief has openly expressed his view that women should not be hired as police officers because they do not have the strength necessary to do the work required by the police department? I would suggest that the only rational answer

37

is no. The hypothetical situation is not dissimilar to that here -- a remark has been made that can be deemed evidence of discriminatory motive and the plaintiff fails to satisfy an objective qualification for the position. I do not believe that Congress anticipated that a plaintiff who patently failed to show that s/he has the minimum qualifications for the position could proceed to trial because of the Civil Rights Act of 1991.

Because Hankins failed to satisfy an objective qualification for the Program Director position, I would affirm.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

38