**Thomas CONWARD, Plaintiff, Appellant,**

v.

**The CAMBRIDGE SCHOOL COMMITTEE, et al., Defendants, Appellees.**

**No. 98–1495.**

United States Court of Appeals, First Circuit.

Heard Feb. 2, 1999.

Decided March 19, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied April 14, 1999.

Joel P. Suttenberg for appellant.

Joseph W. Ambash, with whom Gerald M. Slater and Day, Berry & Howard LLP were on brief, for appellees.

Before SELYA and STAHL, Circuit Judges, and SHADUR,* Senior District Judge.

SELYA, Circuit Judge.

This case involves the discharge of a tenured public school teacher for unbecoming conduct (which the superintendent of schools reasonably classified as sexual harassment). The ousted docent, plaintiff-appellant Thomas Conward, sued the Cambridge School Committee and the superintendent, Mary Lou McGrath, asseverating, *inter alia*, that they had meted out discriminatorily harsh discipline because of his race (Conward is an African American), and had violated both the First Amendment and the Due Process Clause. The district court granted summary judgment in the defendants' favor. *See Conward v. Cambridge Sch. Comm.*, No. 96–11087–GAO, 1998 WL 151248 (D.Mass. Mar.24, 1998). We affirm.

## I. BACKGROUND

■ Applying conventional summary judgment jurisprudence, *see, e.g., National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), we sketch the events surrounding Conward's ouster in the light most flattering to his cause, consistent with record support.

The School Committee employed the appellant as a high-school teacher at Cambridge Rindge and Latin School (CRLS), Cambridge, Massachusetts, for twenty-two years. In that time, he achieved tenure as a "professional teacher." Mass. Gen. Laws ch. 71, § 41. On September 22, 1994, while supervising a study hall, the appellant handed a female student a document entitled "Application for a Piece of Ass" (the Application). He says that, having read only the title, he tendered the paper as an example of improper language

because, moments earlier, the student had spelled out an expletive. The appellant concedes that, had he perused the document fully, he would have found it indecent—the body of the Application comprised a series of lewd questions written in a style emulating a standard employment application—and would not have given it to a teenage girl.

Two days after this incident, the appellant received a letter from McGrath suspending him temporarily, albeit with pay. The letter did not describe the reason for his suspension. On September 28, McGrath wrote another letter requesting the appellant to meet with her on September 30 "for purposes of an investigation concerning your conduct as a teacher." She advised the appellant that he could invite a lawyer and/or a union representative to accompany him.

The appellant belonged to the Cambridge Teachers Association (CTA), the union that represented the relevant bargaining unit. He attended the September 30 session accompanied by Joseph Sullivan, an attorney who doubled in brass as president of the CTA. Immediately prior thereto, Sullivan learned from McGrath's secretary that both the meeting and the earlier suspension stemmed from the Application incident.

When the session began, McGrath informed the appellant that he would be charged with conduct unbecoming a teacher for having passed the Application to a female student. McGrath then showed the appellant statements made by several students describing the episode. Both McGrath and the School Committee's attorney interrogated the appellant about the incident. He readily admitted that he handed the Application to the pupil and explained that he had read no more than the title at that time. The audience ended on an ominous note: McGrath stated that she would suspend the appellant without

* Of the Northern District of Illinois, sitting by designation.

pay and in all likelihood would discharge him.

True to her word, McGrath again wrote to the appellant on October 5, suspending him without pay for ten days and notifying him of her intent to terminate his employment due to the Application incident. This communique specifically referenced the appellant's admission of what he had done, and explained his entitlement to a hearing, see Mass. Gen. Laws ch. 71 §§ 42, 42D, accompanied by counsel if he so chose, "to provide information pertinent to the decision and to [his] status." On October 13, the appellant, through his attorney, waived his right to such a hearing. Seven days later, McGrath forwarded her final epistle, discharging the appellant.

The appellant invoked the collective bargaining agreement, lodged a grievance, and demanded arbitration. The arbitrator found that he had been cashiered for just cause and discerned no mitigating circumstances. The appellant retorted by filing a claim of race discrimination with the appropriate administrative agencies: the federal Equal Employment Opportunity Commission and its state counterpart, the Massachusetts Commission Against Discrimination. Following the dismissal of his administrative claim for lack of evidence and the issuance of a right-to-sue letter, he commenced a civil action in the federal district court.

The appellant's complaint contained a wide-ranging asseverational array, including claims that the defendants (McGrath and the School Committee) had discriminated against him on the basis of his race, abridged his right to freedom of expression, deprived him of procedural due process, and committed acts that gave rise to multiple state-law causes of action. In the early going, the district court dismissed the state-law counts, and the appellant does not question that ruling here. He concentrates his fire instead on the district court's later grant of summary judgment on the federal claims. It is to that ruling which we now turn.

## II. THE SUMMARY JUDGMENT STANDARD

■ A district court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In practice, this rule acts as a firewall to contain the blaze of cases that are so lacking in either factual foundation or legal merit that trial would be a useless exercise. See Celotex Corp. v. Catrett, 477 U.S. 317, 323–24, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir.1991).

■ To facilitate this process, we—like the trial court—accept the properly documented facts in the light most favorable to the nonmovant, resolving all genuine conflicts in his favor, while at the same time refusing to indulge rank speculation or unsupportable hyperbole. See Mesnick, 950 F.2d at 822; Medina–Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990). Once we have culled the essentials of the tale from the record, we consider independently whether the movant has achieved the Rule 56 benchmark.

## III. DISCUSSION

Generically, the appellant claims that the existence of genuine issues of material fact precluded the use of summary judgment in this case. It is against this backdrop that we mull his three remaining claims.

### A. Race Discrimination.

■ The appellant's principal contention is that the lower court too hastily jettisoned his race discrimination claims. Although this contention flies the flags of both 42 U.S.C. § 1981 and Title VII (42 U.S.C. § 2000e et seq.), the subsidiary claims hinge upon identical legal stan-

dards. *See Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996). Consequently, we discuss them together, without differentiating between the two statutes.

■ Under the familiar burden-shifting framework applicable to disparate treatment cases in which no direct evidence of discrimination exists, the first step for any plaintiff is to adduce a prima facie case. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Mesnick*, 950 F.2d at 823. Doing so shifts to the defendant the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *Mesnick*, 950 F.2d at 823. If the defendant accomplishes this task, the plaintiff then reclaims the burden of production. In order to meet this burden, he must offer evidence showing that the defendant's proffered reason is a sham, and that discriminatory animus sparked the defendant's actions. *See McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817; *Medina–Munoz*, 896 F.2d at 9. Despite these shifting burdens of production, the plaintiff throughout retains the burden of persuasion. *See Mesnick*, 950 F.2d at 823.

■■ Under this formula, the appellant's prima facie case normally would include a showing that he was a member of a protected class and qualified for the employment he held, that his employer took an adverse employment action against him, and that his position remained open for (or was filled by) a person whose qualifications were similar to his. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir.1996). Here, the parties agree (for purposes of summary judgment) that the appellant satisfied these general requirements. But the district court took a different tack. Because the appellant had based his claim of disparate treatment on his assertion that the defendants treated his misconduct differently (i.e., more harshly) than comparable misconduct of other, similarly situated white teachers, the court followed the lead of the Eleventh Circuit and construed the prima facie case requirement to call for a "show[ing] that [the plaintiff] is a member of a protected class, that he was qualified for the job from which he was fired, and that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained." *Conward* 1998 WL 151248, at *3 (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984)). Because the court found the appellant's comparative evidence wanting, it rejected the race discrimination claim at the first step of the burden-shifting pavane.

■ The appellant assigns error to this formulation of the prima facie case requirement. He argues that, in a disparate treatment case, the trial court only should consider comparative evidence at the *third* stage of the progression, that is, after the plaintiff has put forward the standard prima facie case and the defendant has responded by articulating a legitimate, nondiscriminatory explanation for the adverse employment action. We agree with the appellant's premise: the district court's sequencing determination was in error, for the time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality *vel non* of the employer's articulated reason for having acted adversely to the plaintiff's interests. *See, e.g., Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 749, 751 (1st Cir.1996); *Lanear v. Safeway Grocery*, 843 F.2d 298, 301–02 (8th Cir. 1988); *see also McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817 (noting that comparative evidence is "especially relevant" for a showing of pretext); *Mesnick*, 950 F.2d at 824 (citing evidence of "differential treatment in the workplace" as one

example of evidence properly used to show pretext).

We need not dwell on this error. In its rescript, the district court made an alternative holding: that, even if it credited the appellant with having furnished a suitable prima facie case, the defendants nonetheless were entitled to *brevis* disposition because the other incidents mentioned by the appellant were incommensurate, and, thus, his evidence was too weak to show *at the third step of the progression* that the defendants' stated reason for firing him masked a racially discriminatory animus. *See Conward,* 1998 WL 151248, at *5. We can find no fault with this alternative rationale, and it fully supports the lower court's entry of summary judgment on the race discrimination claims. Consequently, the court's erroneous sequencing determination was harmless.

 The fatal weakness of the appellant's position is that his evidence, at whatever stage it is addressed, does not raise a genuine issue of material fact as to the authenticity of the defendants' professed reason for dismissing him, nor does it raise such an issue concerning the allegation that racial animus underlay the action. The objective of the burden-shifting framework is to assist the factfinder in determining whether discrimination has occurred. Despite the shifting burdens of production, the plaintiff always remains responsible for proving such discrimination. *See Mesnick,* 950 F.2d at 823. Thus, in a disparate treatment case, "so long as the employer's proffered reason is facially adequate to constitute a legitimate, nondiscriminatory justification for the employer's actions, the trial court's focus in deciding a Rule 56 motion must be on the ultimate question, not on the artificial striations of the burden-shifting framework." *Id.* at 825. In our de novo review of a district court's summary judgment decision, we, too, must focus on the ultimate question.

 Where, as here, the plaintiff in a disparate treatment race discrimination case offers comparative evidence in his quest to raise an inference of racial discrimination, he must provide a suitable provenance for the evidence by showing that others similarly situated to him in all relevant respects were treated differently by the employer. *See Perkins,* 78 F.3d at 751. Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.

> The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared with apples.

*Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir.1989).

To continue the greengrocer's metaphor, the appellant in this instance forswore apples and presented the district court with two persimmons and a pear. Two proffered comparisons involve situations wholly unlike his own and the third bears a passing resemblance to his case, but its essence is so different that the suggested comparison is unreasonable.

 In the first comparison case recounted by the appellant, A, a white male teacher at CRLS, shoved a male student. Although this conduct seemingly violated a school policy prohibiting the use of physical force by teachers against students, McGrath gave A only a written warning. We have no doubt that this conduct was inappropriate for the scholastic environment—but pushing a student is incomparable to the appellant's behavior in several relevant aspects.

The improper use of physical force, on one hand, and sexual harassment, on the other hand, are qualitatively different infractions. They also create distinct problems in the school environment and present significantly different possibilities for remediation. Here, moreover, it is undisputed that McGrath found A's act to have been taken without premeditated intent, but believed the uncontradicted evidence that the appellant had acted deliberately (indeed, the witnesses agreed that he had laughed as he handed the Application to his student). All things considered, the two incidents are not sufficiently alike to support a finding that McGrath acted inconsistently in her handling of them. *See id.; see also Albert v. Carovano,* 851 F.2d 561, 573–74 (2d Cir.1988) (en banc).

■ The appellant's second comparison introduces B, a white female CRLS teacher whom McGrath suspended for five days for striking a male student and urging him to strike her in return. This scenario is similar to that of A, both in that it involved the use of physical force against a student and in that it bears little resemblance to the incident that the appellant provoked. Again, physical touching rather than words · were involved, and there were no sexual overtones. Of course, McGrath deemed B's conduct deliberate, but this lone similarity is not enough to make the two cases, in the *Dartmouth Review* phrase, "fair congeners." [1]

■ C, a white male teacher and track coach at CRLS, is the subject of the third attempted comparison. C was accused of improper conduct with black members of the boys' track team, including sexual touching and commenting about the size of team members' private parts. C denied the accusations and other coaches told McGrath that the alleged touching (patting young men on the buttocks before a race)

was common practice in certain competitive sports. Faced with conflicting evidence and accounts, McGrath negotiated a settlement with the teachers' union that placed C on a one-year unpaid leave of absence from his position as track coach and required him to attend a seminar on racial sensitivity and related subjects.

■ On its facts, this vignette is more like the one that resulted in the appellant's dismissal—but in the end, the analogy falls short. No valid comparison can be drawn between two incidents for the purpose of proving disparate treatment if "differentiating or mitigating circumstances" distinguish either the employee's conduct or the employer's response to it. *Perkins,* 78 F.3d at 751. C, unlike the appellant, did not admit to the misconduct that he was alleged to have committed. His denials cast a distinct light on his case as one founded on a serious conflict over background facts. Because C had not conceded that he engaged in the charged conduct, McGrath had to worry that C might be found innocent and that proceedings against him might result in no disciplinary sanction whatever. With these considerations in mind, McGrath (even though she believed that C had engaged in inappropriate behavior) reasonably could have decided to negotiate some discipline, rather than risk his ultimate exoneration by terminating his employment and precipitating a grievance. No such possibilities were in play in the instant case, which involved only a decision on discipline for conduct that admittedly occurred as reported. We conclude, therefore, that although C's situation is closer to the appellant's than either A's or B's, the circumstances vary sufficiently to distinguish McGrath's responses to them.

We summarize succinctly. It is, of course, true that, in terms of comparative

1. We note in passing that other information about B's disciplinary record cuts in favor of the district court's position. After the incident related above, McGrath dismissed B for making a racially harassing comment to a pupil. That McGrath fired a white teacher in response to her use of inappropriate words provides a much closer comparison to the instant case than the incidents upon which Conward relies.

evidence, similarity, rather than identicality, provides the essential requirement for an analogy. Here, however, the exemplars that the appellant touted to the court below bore too little similarity to the incident in question to furnish a basis for suspecting racial discrimination. It follows that the district court did not err in refusing to draw the exaggerated inferences that the appellant requested. And since the appellant pinned his hopes of showing pretext and racial animus squarely on this evidence, its inadequacy compelled the district court to grant the defendants' motion for summary judgment.

### B. *The First Amendment.*

In addition to his discrimination claims, the appellant challenged his ouster on the ground that it violated his rights under the First Amendment (as incorporated against the states through the Fourteenth Amendment). This claim posited that, in handing over the Application, the appellant was exercising his constitutional rights to free speech and expression. Because the defendants terminated his employment due to that activity, this thesis runs, his dismissal amounted to a constitutional infraction. The district court rejected this construct. *See Conward,* 1998 WL 151248, at *6–*7. So do we.

In order to establish a prima facie case of a First Amendment violation in connection with the loss of public employment, the erstwhile employee must show at a bare minimum both that he was involved in protected activity and that such activity constituted a motivating factor in his employer's decision to discharge him. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Ward v. Hickey,* 996 F.2d 448, 452 (1st Cir.1993). Even though we credit for summary judgment purposes the appellant's assertion that he did not read the contents of the Application beyond the title, his claim founders on the first prong of this paradigm.

The appellant's endeavor to show that his activity—handing the Application to the student—warranted First Amendment protection encounters two obstacles. The initial problem is that the First Amendment protects only speech itself and other expressive conduct that is "inten[ded] to convey a particularized message" under circumstances in which "the likelihood [i]s great that the message would be understood by those who view[ ] it." *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam). Even if the appellant harbored an intent, as he now says, to suggest by his transmittal of the Application that swear words were inapropos for a scholastic environment, it strikes us as highly unlikely that an adolescent pondering the lascivious questions that make up the Application would have understood that message.

We need not probe this point too deeply for, even if the act of handing the document to the student were a type of activity that could warrant First Amendment protection, the Application's indecent content permitted its regulation in a high-school setting. Let us be perfectly clear: we do not suggest that the Application is "obscene" in the legal sense (and, thus, lawfully subject to content-based regulation under the First Amendment). After all, to determine obscenity, a court must ask "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Consistent with the high degree of protection that our Constitution affords to freedom of speech and expression, this is a purposely narrow definition. Raw as the Application is, it does not fall within the cramped confines of legal obscenity.

Yet, the failure of the Application to sink to these depths does not end the inquiry. What a teacher may impart to his pupils in a school environment is not

determined by reference to conventional obscenity standards. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 684–86, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); *Keefe v. Geanakos*, 418 F.2d 359, 362 (1st Cir.1969). Although those who work and study in a school environment do not abandon their First Amendment rights when they pass through the portals, *see Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), school officials do have broad discretion to restrict school speech in order to further educational goals, *see Bethel*, 478 U.S. at 683–86, 106 S.Ct. 3159; *Ward*, 996 F.2d at 452. This discretion includes not only the right to design curricula and select textbooks, but also the right to impose regulations in order to ensure "that readers or listeners are not exposed to material that may be inappropriate for their level of maturity." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

 Of course, the relevant legal framework strives to balance the need for faculty and students to retain expressive rights against the need for school officials to maintain an appropriate educational environment. Thus, regulations restricting classroom speech are constitutional if, and to the extent that, they are reasonably related to legitimate pedagogical concerns, provided, however, that those who may choose to speak are given appropriate notice of what sorts of expressive conduct are out of bounds. *See Ward*, 996 F.2d at 452. Keeping scatological documents away from impressionable youngsters is certainly a reasonable educational objective. *See Bethel*, 478 U.S. at 683–86, 106 S.Ct. 3159.

 The record in this case does not indicate whether the School Committee specifically proscribed by rule the in-school use of indecent language. However, the *Ward* standard does not require schools to

"expressly prohibit every imaginable inappropriate conduct by teachers;" the standard requires only that teachers be able reasonably to predict the types of conduct that are prohibited. *Ward*, 996 F.2d at 454. We find that the Massachusetts statute permitting termination of a professional teacher for "conduct unbecoming a teacher," Mass. Gen. Laws ch. 71, § 42, furnished sufficient notice under this standard that indecent speech directed to students was impermissible.[2]

That ends this phase of our inquiry. Because the appellant's conduct was legitimately subject to regulation under the First Amendment, the district court did not err in granting *brevis* disposition on the "freedom of expression" claim.

## C. *Due Process.*

 In addition to his substantive claims, the appellant attacks the process accorded to him. Under state law, a school board can terminate the employment of tenured teachers only for certain enumerated causes. *See* Mass. Gen. Laws ch. 71, § 42. Even so, the School Committee's actions must take into account procedural protections afforded by the Due Process Clause of the Fourteenth Amendment. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

 In the public employment context, the basic requirements of due process are notice of the charges brought against the job-holder and an opportunity to respond to them. *See Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487 ("The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."). In this instance, the appellant

---

**2.** Indeed, the appellant has admitted that the contents of the Application were wholly inap- propriate for school use.

**24**

received all the process that was due. At the September 30 meeting, McGrath and the School Committee's lawyer recounted the charges, showed Conward witness statements describing the Application incident, and offered him a chance to tell his version of events.

The appellant argues that this notice came too late to be constitutionally adequate and that, because he had too little time to prepare, he was unable meaningfully to respond on the day in question. Whatever force these plaints otherwise might have had was dissipated when, before ending his employment, the defendants extended to him an additional invitation to furnish his version of relevant events at a pre-termination hearing, *see* Mass. Gen. Laws ch. 71, § 42D, and the appellant explicitly declined the invitation. Having waived this golden opportunity to exercise his due process rights, he cannot now be heard to decry their deprivation. *See Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 413–14 (7th Cir.1994). Because the appellant received the full procedural panoply that the law prescribes, the district court appropriately rejected his due process claim.

## IV. CONCLUSION

We need go no further. The sanction that McGrath imposed admittedly is harsh. On this record, however, the appellant is unable to show, even in the limited way necessary to survive summary judgment, that racial discrimination, unconstitutionally suppressed expression, or the withholding of due process cost him his job. Consequently, we affirm the entry of summary judgment in the defendants' favor.

*Affirmed.*