<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1692

                 HENRY JOHN FERNANDES, ET AL.,

                    Plaintiffs, Appellants,

                               v.

                 COSTA BROTHERS MASONRY, INC.,

                      Defendant, Appellee.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

         [Hon. Richard G. Stearns, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
                Coffin, Senior Circuit Judge,
                                
                  and Stahl, Circuit Judge.
                                
                                
                                
    Renee J. Bushey, with whom Michael A. Feinberg and Feinberg,
Charnas & Birmingham, P.C. were on brief, for appellants.
    Richard W. Gleeson, with whom Gleeson & Corcoran was on brief,
for appellee.

December 29, 1999

                                
                                

 SELYA, Circuit Judge.  Henry John Fernandes, Richard H.
Gilbert, and Benjamin G. Rose, all dark-skinned Cape Verdeans,
sued their quondam employer, Costa Brothers Masonry, Inc. (Costa
Bros.), alleging a discriminatory failure to rehire.  They now
appeal from an order granting summary judgment against them.  Their
appeal requires us to explore how courts charged with resolving
discrimination cases should choose between pretext analysis (an
approach first limned in McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973)) and mixed-motive analysis (an alternative approach
limned later in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)
(plurality opinion)).  We conclude, as did the district court, that
the evidence thus far adduced does not trigger mixed-motive
analysis.  We also conclude, however, that under a properly
performed pretext analysis, the appellants' case should have
survived.  Consequently, we vacate the judgment and remand for
further proceedings.
I.  THE FACTS
 As the summary judgment standard demands, we take the
facts in the light most hospitable to the appellants, indulging all
reasonable inferences in their favor.  See Conward v. Cambridge
Sch. Comm., 171 F.3d 12, 17 (1st Cir. 1999).  Mindful of this coign
of vantage, we deliberately omit from our narrative versions of
certain conversations and events that conflict with the appellants'
accounts.
 In 1995, Stone Building Company secured a contract to
construct a new high school in Mashpee, Massachusetts.  It engaged
Costa Bros. as the masonry subcontractor.  Because the job was
publicly funded, contractors and subcontractors were told that they
had to conform to specific equal employment opportunity (EEO) rules
and to issue weekly EEO summaries documenting the number of hours
worked by minority employees.
 A Portuguese immigrant, Domingos DaCosta, owns Costa
Bros.  On November 13, 1995, he retained Sebastian Ceribelli, a
Brazilian, as the masonry foreman for the Mashpee project.  DaCosta
and Ceribelli then hired a number of masons and laborers to work on
the job.  Those engaged on November 27 included five masons   the
appellants and two white males, George Choquette and George
Medeiros   and a dark-skinned Cape Verdean laborer, Glenn Spinola.  
These six men worked as a team until December 7, when Ceribelli
laid off all six due to winter weather conditions and lack of heat
in the workplace.  He vowed that he would recall them when the
heating quandary had been solved.  Other workers were laid off at
roughly the same time (although some, unlike the appellants, were
assigned to ongoing Costa Bros. projects elsewhere).
 On or about December 13, Costa Bros. resumed work on the
Mashpee project.  It recalled some masons (but not the appellants).  
Gilbert visited the job site the following week and asked Ceribelli
when he would be rehired.  Ceribelli responded, "The way things are
going now . . . I wouldn't count on it."
 Rose sojourned to the site the next Saturday.  He noticed
masons working there and queried DaCosta about this circumstance.  
DaCosta replied, "We're doing a little fixing up here."  Rose then
asked, "Are we going to get called back?"  DaCosta responded,
"We're going to close in"   a comment that Rose reasonably took to
mean that the building would be enclosed in order to create a
heated space in which masons could work.
 Having heard nothing further, Rose checked back two weeks
later.  He saw that the job site was fully heated and asked
DaCosta, "Aren't we coming back?"  DaCosta replied cryptically,
"Well, I got my men."  When Rose inquired about what had happened
to the plan to recruit residents and minorities, DaCosta stated, "I
don't need minorities, and I don't need no residents on this job.  
I got my men."  Rose complained that DaCosta had "twelve new faces"
working on the project, but DaCosta abruptly terminated the
conversation.
 In point of fact, Costa Bros. recalled a total of
eighteen workmen (masons and laborers) between December 13 and
January 25, and hired ten new ones in that span (none of whom had
worked previously for Costa Bros.).  All twenty-eight were white
males.
 Fernandes returned to the job site on numerous occasions
in December and January.  Each time, DaCosta told him that there
was no work available but to come back again.  After several weeks,
Fernandes asked Ceribelli why he and the other Cape Verdeans had
not been recalled.  Ceribelli replied that Costa Bros. "had only
hired a few minorities because of local pressure."
 On January 30, DaCosta, James Byrne (the clerk of the
works), and a representative of the general contractor met with
Fernandes, Raoul Galvin (a civil rights activist), and others from
the local community regarding Costa Bros.'s compliance with EEO
requirements.  Galvin noted that Costa Bros. had hired more
workers, all of whom were white, but that it had no minorities
working at the site.  He implored DaCosta to rehire Fernandes
because "whatever was going on at the time would stop if he at
least put one of [the Cape Verdeans] back to work."  DaCosta
indicated that he would honor this request.
 Fernandes reported for duty the following Monday but was
informed that there was no work available.  This experience was
repeated several times.  Costa Bros. finally restored Fernandes to
the payroll on March 26, albeit as a laborer rather than as a
mason.  On the same day, Ceribelli warned him to "watch out"
because DaCosta was "going to be on [his] back."  This prediction
proved prophetic:  according to Fernandes, DaCosta "followed [him]
around," constantly "hollering and screaming" at him.
 When Fernandes reported for work the next morning,
DaCosta instructed him to get an "F block" (or so he thought).  
Fernandes was unsure what an "F block" was and asked DaCosta (who,
as matters turned out, had wanted a standard "half block").  After
castigating Fernandes for his ignorance, DaCosta declared that he
was "tired of . . . what's going on between you guys," and voiced
the opinion that "[y]ou guys are trying to hurt me."  He then
proclaimed:  "I don't have to hire you locals or Cape Verdean
people.  This is my business.  It belongs to me."  At that
juncture, DaCosta fired Fernandes.
II.  TRAVEL OF THE CASE
 After pursuing administrative remedies, see 42 U.S.C.  
2000e-5(e); Mass. Gen. Laws ch. 151B,  5, the appellants sued.  In
their complaint, they alleged discrimination on the basis of race
and color in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C.  2000e to 2000e-17, and its state-law analogue,
Mass. Gen. Laws ch. 151B,  4(1).  Costa Bros. denied the material
allegations of the complaint, and the parties spent the next year
conducting pretrial discovery.  From the record and the briefs, it
appears that the appellants' original claim was constructively
amended to include discrimination predicated on national origin,
and the case went forward on that assumption.
 In due course, Costa Bros. moved for summary judgment,
see Fed. R. Civ. P. 56, and the appellants filed an opposition.  
The district court heard oral argument, took the matter under
advisement, and thereafter granted the motion as to all claims.  In
its unpublished rescript, the court characterized DaCosta's
statement that "I don't need minorities . . . on this job" as a
stray remark, insufficient to trigger mixed-motive analysis.  
Although the court catalogued DaCosta's comment that "I don't have
to hire you locals or Cape Verdean people" in its recitation of the
facts, it did not mention this comment thereafter.
 Undertaking pretext analysis, the court focused on two
white masons who had been hired in January 1996   Piper and
Winters.  The court ruled that the Piper hiring did not assist the
appellants because Piper had special skills and they could not
establish that their qualifications were equivalent to his.  As to
Winters, the court accepted Costa Bros.'s explanation that it had
hired him on the recommendation of another employee, characterizing
what had happened as cronyism rather than discrimination.  The
court never discussed whether the record sufficed to support a
finding that this explanation was pretextual, nor did it explore
the numerous other employment decisions that Costa Bros. made in
the December-January time frame.  This appeal followed.
III.  DISCUSSION
 The appellants asseverate that the district court erred
in choosing a legal framework and that, even if the court marched
down an acceptable analytic path, it did not stay on track.  We
consider these arguments in sequence, pausing first to frame the
choice-of-approach issue.  We then briefly address the appellants'
state-law claim.
              A.  The Available Analytic Methods.
 A plaintiff alleging disparate treatment under Title VII
may proceed on a mixed-motive approach or on a pretext approach.  
For purposes of this case, it is important to understand the basic
difference between these two modalities.
 Mixed-motive analysis applies when the evidence shows
that an employer considered both a proscribed factor (say, race)
and one or more legitimate factors (say, competence) in making a
challenged employment decision.  See  Price Waterhouse, 490 U.S. at
241-42.  In that scenario, the plaintiff is not obliged to separate
out the relative import of each element that went into the
decision; rather, once the plaintiff proves that a proscribed
factor "played a motivating part" in the decision, the burden of
persuasion shifts to the employer, who will be held liable for
damages under Title VII unless "it can prove that, even if it had
not taken [the proscribed factor] into account, it would have come
to the same decision regarding [the plaintiff]."  Id. at 242, 244.  
Even then, because Congress has reshaped mixed-motive analysis in
certain respects, the employee may be entitled to equitable relief
so long as he has proven that the proscribed factor played some
part in the decisional calculus.  See 42 U.S.C.  2000e-2(m);
2000e-5(g)(2)(B); see also Higgins v. New Balance Athletic Shoe,
Inc., 194 F.3d 252, 259 n.3 (1st Cir. 1999); Carey v. Mt. Desert
Island Hosp., 156 F.3d 31, 43-44 (1st Cir. 1998).
 It is readily apparent that this mixed-motive approach,
uncabined, has the potential to swallow whole the traditional
McDonnell Douglas analysis.  To guard against this possibility, the
Court restricted its applicability to those infrequent cases in
which a plaintiff can demonstrate with a high degree of assurance
that the employment decision of which he complains "was the product
of a mixture of legitimate and illegitimate motives."  Price
Waterhouse, 490 U.S. at 247.  Under this formulation, access to the
mixed-motive approach ultimately depends on the quality of the
available evidence.  Most courts agree that Justice O'Connor's
seminal concurrence in Price Waterhouse furnishes the best device
for testing quality (and, thus, the best roadmap for segregating
mixed-motive cases from the mine-run of discrimination cases).  
After all, when the Supreme Court rules by means of a plurality
opinion (as was true in Price Waterhouse), inferior courts should
give effect to the narrowest ground upon which a majority of the
Justices supporting the judgment would agree.  See Marks v. United
States, 430 U.S. 188, 193 (1977).  The O'Connor concurrence fits
this profile.  Hence, we turn to it.
 "What is required [to trigger mixed-motive analysis] is
. . . direct evidence that decisionmakers placed substantial
negative reliance on an illegitimate criterion in reaching their
decision."  Price Waterhouse, 490 U.S. at 277 (O'Connor, J.,
concurring).  Because discrimination tends more and more to operate
in subtle ways, direct evidence is relatively rare; when it comes
to light, however, a plaintiff can use it to demonstrate "that an
illegitimate factor played a substantial role in a particular
employment decision."  Id. at 275.  It follows that plaintiffs may
use the Price Waterhouse mechanism in disparate treatment cases in
which they adduce direct evidence of a discriminatory animus,
whereas they must proceed under the conventional McDonnell Douglas
framework (commonly called "pretext analysis") in all other cases.  
See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st
Cir. 1996).
 Under the pretext method, the plaintiff first must
establish a prima facie case.  See Texas Dep't of Comm'y Affairs v.
Burdine, 450 U.S. 248, 252-53 (1981); McDonnell Douglas, 411 U.S.
at 802.  We shall return to the components of the prima facie case;
for now, it suffices to say that this requirement is "not onerous."  
Burdine, 450 U.S. at 253.  If the plaintiff clears this modest
hurdle, the burden of production   but not the burden of persuasion
 shifts to the employer, who must articulate a legitimate,
nondiscriminatory reason for the adverse employment action.  See
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993);
Burdine, 450 U.S. at 254-55.  Once that occurs, the plaintiff must
show both that the employer's "proffered reason is a sham, and that
discriminatory animus sparked [its] actions."  Conward, 171 F.3d at
19.  To this end, the full panoply of circumstantial evidence is
available, including but not limited to "statistical evidence
showing disparate treatment by the employer of members of the
protected class, comments by decisionmakers which denigrate
[persons in the protected group], the incidence of differential
treatment in the workplace, and the deployment of . . .
replacements."  Mesnick v. General Elec. Co., 950 F.2d 816, 824
(1st Cir. 1991) (citations omitted).  The totality of the evidence
then is examined "as part of an aggregate package of proof."  Id.
 A plaintiff, uncertain of what discovery will yield or
how a judge will react to certain proffers, may elect to proceed
simultaneously on both fronts (mixed-motive and pretext), cognizant
that the trial court, at an appropriate stage of the litigation,
will channel the case into one format or the other.  See Price
Waterhouse, 490 U.S. at 247 n.12; Thomas v. National Football
League Players Ass'n, 131 F.3d 198, 202 (D.C. Cir. 1997).  
Consistent with the O'Connor concurrence, the court typically will
make that determination based on the availability or unavailability
of direct evidence.  See Taylor v. Virginia Union Univ., 193 F.3d
219, 232 (4th Cir. 1999) (en banc); Ostrowski v. Atlantic Mut. Ins.
Cos., 968 F.2d 171, 181-82 (2d Cir. 1992).
 This ruling can have important effects on the outcome of
the litigation.  In a mixed-motive analysis, "the burden of
persuasion shifts from the employee to the employer, who must then
affirmatively prove that it would have made the same decision even
if it had not taken the protected characteristic into account."  
Ayala-Gerena, 95 F.3d at 95-96; accord Price Waterhouse, 490 U.S.
at 246 (explaining that, under a mixed-motive analysis, "the
plaintiff must persuade the factfinder on one point, and then the
employer, if it wishes to prevail, must persuade it on another").  
This contrasts vividly with pretext analysis, under which the
employee retains the burden of persuasion throughout.  See Cumpiano
v. Banco Santander P.R., 902 F.2d 148, 153 (1st Cir. 1990).
                   B.  Mixed-Motive Analysis.
 With this preface, we turn to the appellants' contention
that the lower court erred in eschewing a mixed-motive analysis.  
Because this case comes to us on appeal from an order granting
brevis disposition, we afford de novo review.  See Conward, 171
F.3d at 18.
 As our earlier discussion indicates, direct evidence is
the touchstone for mixed-motive analysis.  Hence, the fate of the
appellants' present contention hinges on whether they adduced
direct evidence of Costa Bros.'s use of a proscribed factor (race,
color, and/or national origin) in the decisional process.  
Answering that question is more difficult than might appear at
first blush.  To be sure, Justice O'Connor furnished a trenchant,
universally accepted example of what is not direct evidence:  stray
remarks, such as "statements by nondecisionmakers, or statements by
decisionmakers unrelated to the decisional process itself."  Price
Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring).  Since
then, however, jurists have struggled in attempting to define the
term affirmatively.  This operose task not only has divided the
courts of appeals but also has created a patchwork of intra-circuit
conflicts.  Generally speaking, three schools of thought have
emerged.
 1.  The "Classic" Position.  Some courts adopt the
traditional definition of "direct evidence" for this purpose,
holding that the term signifies evidence which, if believed,
suffices to prove the fact of discriminatory animus without
inference, presumption, or resort to other evidence.  See, e.g.,
Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir.
1999); Haas v. Advo Sys., Inc., 168 F.3d 732, 734 n.2 (5th Cir.
1999); EEOC v. Wiltel, Inc., 81 F.3d 1508, 1514 (10th Cir. 1996);
Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 40 (5th Cir. 1996).  
Although only the Fifth and Tenth Circuits cling consistently to
this view, other tribunals have embraced it periodically.  See,
e.g., Carter v. Three Springs Resid'l Treatment, 132 F.3d 635, 641
(11th Cir. 1998); Troupe v. May Dep't Stores Co., 20 F.3d 734, 736
(7th Cir. 1994).
 2.  The "Animus Plus" Position.  The Fourth Circuit,
sitting en banc, recently defined "direct evidence" for this
purpose as evidence, both direct and circumstantial, of conduct or
statements that (1) reflect directly the alleged discriminatory
animus and (2) bear squarely on the contested employment decision.  
See Taylor, 193 F.3d at 232.  The D.C. Circuit takes the same view.  
See Thomas, 131 F.3d at 204.  The Ninth Circuit seems headed in
this direction.  See Lambert v. Ackerley, 180 F.3d 997, 1008-09
(9th Cir. 1999) (en banc), petition for cert. filed, 68 U.S.L.W.
3292 (U.S. Oct. 20, 1999) (No. 99-681).  The Third Circuit at one
time was in the "animus plus" camp, see Walden v. Georgia-Pacific
Corp., 126 F.3d 506, 513 (3d Cir. 1997), cert. denied, 118 S. Ct.
1516 (1998), but that court is poised to revisit the question.  See
Hankins v. City of Philadelphia, 189 F.3d 353 (3d Cir. 1999),
rehearing en banc granted, opinion vacated, 188 F.3d 217 (3d Cir.
1999).  Two other courts of appeals have indicated occasional
approval of this approach, see, e.g., Sheehan v. Donlen Corp., 173
F.3d 1039, 1044 (7th Cir. 1999); Deneen v. Northwest Airlines,
Inc., 132 F.3d 431, 436 (8th Cir. 1998), but as the cases cited
herein indicate, both of these courts have flirted with other
formulations.  Courts endorsing the animus plus position do not
distinguish between direct and circumstantial evidence in the
classic sense but, rather, emphasize that the mixed-motive trigger
depends on the strength of the plaintiff's case.  See, e.g.,
Kubicko v. Ogden Logistics Servs., 181 F.3d 544, 553 (4th Cir.
1999) (emphasizing that whether a case falls under the mixed-motive
or pretext rubric "ultimately hinges on the strength of the
evidence establishing discrimination") (citation and internal
quotation marks omitted); Thomas, 131 F.3d at 204 (similar).
 3.  The "Animus" Position.  A few courts resolve the
direct evidence conundrum by the simple expedient of deleting the
"plus" from the "animus plus" formulation.  Those courts opine that
as long as the evidence (whether direct or circumstantial) is tied
to the alleged discriminatory animus, it need not bear squarely on
the challenged employment decision.  The Second Circuit advocates
this position.  See, e.g., Lightfoot v. Union Carbide Corp., 110
F.3d 898, 913 (2d Cir. 1997); Ostrowski, 968 F.2d at 182.  The
Eighth Circuit intermittently takes this stance, see, e.g., Kerns
v. Capital Graphics, Inc., 178 F.3d 1011, 1017-18 (8th Cir. 1999);
Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir.
1993), and two other cases appear to fit somewhat loosely into this
category, see Wright v. Southland Corp., 187 F.3d 1287, 1303-04
(11th Cir. 1999); Hennessy v. Penril Datacomm Networks, Inc., 69
F.3d 1344, 1348-50 (7th Cir. 1995).
 4.  The First Circuit's Position.  To complete our survey
of the legal landscape, we direct our gaze inward.  Although we
have dropped inconclusive hints here and there, see, e.g., Ayala-
Gerena, 95 F.3d at 95-96; Smith v. F.W. Morse & Co., 76 F.3d 413,
421 (1st Cir. 1996), we have yet to choose among these conflicting
approaches.  Thus, the question is wide open in this circuit.
 5.  The Case at Hand.  This case does not require us to
fill the void, and we decline to do so gratuitously.  The
appellants contend that two comments attributed to DaCosta   "I
don't need minorities, and I don't need residents on this job" and
"I don't have to hire you locals or Cape Verdean people"   
constitute direct evidence that a proscribed factor influenced
Costa Bros.'s hiring practices.  The employer demurs, asserting
that these are merely "stray remarks" and, in all events, lack
sufficient probative force to constitute direct evidence.
 We do not share the view that DaCosta's statements must
be classified as stray remarks.  As we have pointed out, DaCosta
was the ultimate decisionmaker, and both pronouncements pertained
to the decisional process.  He made the first statement when
refusing to rehire Rose; because it bore directly on a challenged
employment decision, it hardly qualifies as a stray remark.  See,
e.g., Deneen, 132 F.3d at 436; Diaz-Gandia v. Dapena-Thompson, 90
F.3d 609, 616 (1st Cir. 1996).  DaCosta uttered the second
statement when cashiering Fernandez and, although this suit does
not challenge Fernandes's dismissal per se, see infra note 3, we
think that the comment, which in terms bears upon Costa Bros.'s
repeated refusals to rehire the appellants, sufficiently implicates
the decisional process to avoid classification as a stray remark.  
See Wichmann v. Board of Trustees, 180 F.3d 791, 802 (7th Cir.
1999), petition for cert. filed, 68 U.S.L.W. 3154 (U.S. Sept. 3,
1999) (No. 99-411); Thomas, 131 F.3d at 204.
 In the last analysis, however, this taxonomic triumph
constitutes a hollow victory for the appellants.  Despite the fact
that these statements cannot be brushed aside as stray remarks,
they are inherently ambiguous and, as such, do not directly reflect
the alleged animus.  The first   "I don't need minorities and I
don't need residents on the job"   may be interpreted either as an
admission of an exclusionary hiring practice (thus explicating the
true reason for DaCosta's actions) or as a benign response to a
specific inquiry reflecting DaCosta's (erroneous) perception that
he no longer had to make special efforts to comply with EEO
requirements.  The second   "I don't have to hire you locals or
Cape Verdean people"   may be interpreted either as a
discriminatory explanation for DaCosta's actions or as a response
to what he perceived as an unjustified attempt to impose some sort
of quota system upon his company.
 Under any of the three views we have delineated, these
statements do not rise to the level of direct evidence.  Courts
that take the "classic" position have contrasted direct evidence
with, inter alia, ambiguous statements, and have indicated that the
latter will not suffice.  See Maldonado v. U.S. Bank, 186 F.3d 759,
763 (7th Cir. 1999); Troupe, 20 F.3d at 736-37.  Courts that take
either the "animus plus" or "animus" position place great emphasis
on the strength of the proof of discriminatory animus.  See, e.g.,
Fuller v. Phipps, 67 F.3d 1137, 1142-43 (4th Cir. 1995); Thomas,
131 F.3d at 204; Fields v. New York State Office of Mental
Retardation & Developmental Disabilities, 115 F.3d 116, 122 (2d
Cir. 1997); Ostrowski, 968 F.2d at 182.  In our judgment,
inherently ambiguous statements, without more, cannot supply the
strong evidence that these courts rightfully demand as a
prerequisite to mixed-motive analysis.  We conclude, therefore,
that a statement that plausibly can be interpreted two different
ways   one discriminatory and the other benign   does not directly
reflect illegal animus and, thus, does not constitute direct
evidence.  See, e.g., Carter, 132 F.3d at 641 ("We have held that
statements that are open to more than one interpretation do not
constitute direct evidence of racial discrimination."); Troupe, 20
F.3d at 736-37 (similar).  Thus, DaCosta's statements do not serve
to unlatch the door to the mixed-motive approach.
                     C.  Pretext Analysis.
 Having determined that the district court appropriately
selected pretext analysis as the method of choice, we next examine
the court's execution of that analysis.  We again afford plenary
review.  See Conward, 171 F.3d at 18.
 1.  The Prima Facie Case.  Notwithstanding Costa Bros.'s
tendency to conceptualize this appeal as a reduction-in-force case,
the appellants' complaint squarely alleges a discriminatory failure
to rehire.  Because the appellants have not complained that the
layoff itself was discriminatory, the employer's focus on the
elements of a prima facie reduction-in-force case is misplaced.  
The proper focus is on failure to rehire, and the proper source for
the elements of a prima facie failure-to-rehire case is McDonnell
Douglas itself.
 Under that authority, a plaintiff alleging a failure to
rehire establishes his prima facie case by showing:
   (i) that he belongs to a racial minority; (ii)
 that he applied and was qualified for a job
 for which the employer was seeking applicants;
 (iii) that, despite his qualifications, he was
 rejected; and (iv) that, after his rejection,
 the position remained open and the employer
 continued to seek applicants from persons of
 complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802.  Contrary to Costa Bros.'s
contention, a plaintiff need not show as part of his prima facie
case that the employer either recalled similarly situated non-
minority employees or otherwise treated employees of different
ethnic backgrounds more favorably.  See Perry v. Woodward, 188 F.3d
1220, 1228-29 (10th Cir. 1999); Conward, 171 F.3d at 19-20; Walker
v. Mortham, 158 F.3d 1177, 1179 n.2, 1186 (11th Cir. 1998), cert.
denied, 120 S. Ct. 39 (1999); Walker v. St. Anthony's Med. Ctr.,
881 F.2d 554, 558 (8th Cir. 1989); see also Cumpiano, 902 F.2d at  
155 n.2.
 Against this benchmark, we conclude without serious
question that the appellants established a prima facie case.  The
first prong is uncontroversial; all three appellants are Cape
Verdean and, as such, belong to a racial minority.  The second
element also falls easily into place:  all three performed
satisfactorily as masons prior to the layoff and plainly were
qualified to do the work.
 Turning to the third facet of the prima facie case, the
record establishes that all three appellants returned to the job
site at various times after the layoff and sought reinstatement.  
For the most part, Costa Bros. rebuffed these efforts.  The sole
exception   the time in March when DaCosta capitulated to external
pressure and hired Fernandes as a laborer, only to fire him on his
second day of work   hardly suffices to tip the balance.  Cf.
International Bhd. of Teamsters v. United States, 431 U.S. 324,
341-42 (1977) (explaining that subsequent changes in corporate
"hiring and promotion policies . . . could not erase [the
company's] previous illegal conduct or its obligation to afford
relief to those who suffered because of it").  This is especially
so since what transpired on that occasion plausibly can be
interpreted (drawing permissive inferences favorable to the
appellants) as further evidence of DaCosta's discriminatory
treatment of Fernandes.  After all, DaCosta had resisted rehiring
Fernandes for several weeks and had to be persuaded to do so by a
civil rights advocate.  Moreover, Ceribelli   the Costa Bros.
foreman   forewarned Fernandes that DaCosta would be "on [his]
back," and the sequence of events that followed reasonably could be
seen as proof of the pudding.
 The appellants also fulfilled the final prima facie case
requirement.  In the relevant time frame (December-January), Costa
Bros. had an ongoing need for masons on the Mashpee project, hiring
and recalling many throughout the period.  For aught that appears,
the qualifications of the vast majority of these masons were much
the same as the appellants' qualifications.  No more is exigible.  
See Conward, 171 F.3d at 19.
 Costa Bros.'s efforts to dispute this element of the
prima facie case are unavailing.  In the district court, it
characterized its hiring practices as "simply react[ing] to men who
appeared at the right place at the right time," and argued that it
had no need for additional help at the precise moments that the
appellants inquired.  On this chiaroscuro record, a jury might so
find   but it also might find this to be a self-serving fiction.   
 It may or may not be a coincidence that, of the nineteen
men whom DaCosta furloughed on December 7 and 8 (the three
appellants, plus Choquette, George Medeiros, Spinola, William
Ceribelli, Juliao Fernandes, Victor Fernandez, Martirio Neto,
Antonio Santo, Jose Silva, Artur Teles, Antonio DaSilva, Fernando
DaSilva, Miguel Silva, Joseph Pimenthal, Jose Claudino, and Dinos
Medeiros), all but five either were reassigned to another Costa
Bros. job or recalled in mid-December.  Likewise, it may or may
not be coincidental that four of the excluded five (the three
appellants and Spinola) comprised the entire complement of minority
employees who had toiled on the Mashpee project.  Moreover, the
fourteen men who were given an opportunity to work for Costa Bros.
either at Mashpee or on another project in mid-December included
two white masons (George Medeiros and William Ceribelli) and three
white laborers (Joao Bolarinho, Fernando DaSilva, and Artur Teles)
who had been hired, and then furloughed, on approximately the same
dates as the appellants.
 Costa Bros. attempts to blunt the force of this evidence
in three ways.  First, it notes that George Medeiros, though
recalled, only worked for four days.  The fact remains, however,
that he was recalled and the appellants were not.  Second, Costa
Bros. points out that one member of the excluded group (Choquette)
was a white mason.  That is true as far as it goes   but it does
not go very far:  the record is devoid of evidence that Choquette
applied for reinstatement at any time.  Third, Costa Bros. asserts
that it rehired Spinola in April 1996.  We think that this fact
possesses only marginal relevance here, inasmuch as Spinola's
recall occurred well beyond the December-January period during
which the appellants unsuccessfully sought reinstatement.
 In addition to the fourteen rehires just discussed, the
record indicates that Costa Bros. engaged a half-dozen new workers
for determinate positions during late December and January:  Carlos
Bolarinho (a laborer, hired on December 29); Piper (a mason, hired
on January 2); Winters (a mason, hired on January 10); Joaquim
Fernandes (a laborer, hired on January 18); Dan Cormier (a laborer,
hired on January 22); and Luis Amaro (a laborer, hired on January
23).  All were white.  Costa Bros. recruited four more white males
(Antonio Reboca, Joao Soares, Michael Oliveira, and Steven Downey)
on various dates between January 5 and January 25.  Although these
four were assigned to work on the Mashpee project, we cannot
accurately determine from the existing record which were masons and
which were laborers.
 These figures make the appellants' point emphatically.  
They create an ample evidentiary platform for a finding that,
during the relevant two-month period, Costa Bros. sought applicants
possessing qualifications similar to those of the appellants for
open positions.  Thus, the prima facie case was fully formed.
 2.  The Employer's Reason.  We proceed to the next step
of the McDonnell Douglas pavane:  Costa Bros.'s professed reason
for failing to rehire the appellants.  In its response to a
discovery request, Costa Bros. stated that it hired others in the
pertinent time frame because it "needed masons or laborers and the
individuals [eventually hired] were available."  It also stated
that, apart from Piper and Winters, all the masons that it engaged
"were currently working or had worked for Costa Brothers."  The
employer glossed these statements in its summary judgment papers,
maintaining that it "simply reacted to men who appeared at the
right place at the right time and put them to work."
 As to Piper and Winters, Costa Bros. makes situation-
specific arguments.  Piper,  it says, had special skills as a
layout man, and Winters was recommended by Victor Fernandez,
another Costa Bros. employee.
 We assume, for argument's sake, that these reasons, in
the aggregate, constitute legitimate, nondiscriminatory grounds for
hiring others in lieu of recalling the appellants.  Accordingly, we
proceed to the third and final stage of the McDonnell Douglas
inquiry.
 3.  Pretext for Discrimination.  Once the employer
articulates a legitimate, nondiscriminatory reason for a challenged
employment decision, the plaintiff must be accorded a fair chance
to show that the stated reason disguised a discriminatory animus.  
See McDonnell Douglas, 411 U.S. at 804; Pagano v. Frank, 983 F.2d
343, 348 (1st Cir. 1993).  As long as the plaintiff offers evidence
of pretext, the trial court must not accept the employer's
proffered reason for the adverse employment action at face value,
no matter how plausible it may sound, but must proceed to the final
analytic step.  See McDonnell Douglas, 411 U.S. at 804.  To that
end, we review the summary judgment record.
 We start with the employer's situation-specific reasons.  
The lower court accepted without further inquiry Costa Bros.'s
explanations of why it hired Piper and Winters.  We are not so
sanguine.
 That said, we cannot fault the district court's ruling
vis--vis Piper.  Costa Bros. asserts without contradiction that it
needed a layout man on the job and that none of the appellants
possessed this particular skill.  If true, this rationale suffices
to dispel any odor of unfair discrimination, see Hill v. Seaboard
Coast Line R.R. Co., 767 F.2d 771, 774 (11th Cir. 1985), and the
appellants neither contested the need for a layout man nor claimed
to possess the requisite skill set.
 Winters's hiring is more problematic.  The district court
characterized this event as cronyism, not discrimination (and
therefore lawful, though perhaps unsavory).  For this proposition,
it relied upon our opinion in Foster v. Dalton, 71 F.3d 52 (1st
Cir. 1995).  Foster, however, cannot carry the weight that the
district court thrust upon it.
 In Foster, the trial court concluded that cronyism, not
race discrimination, had prompted a hiring decision.  See id. at
55.  We upheld that conclusion, ruling that "in this case, cronyism
provides a sufficient alternative explanation" for the decision.  
See id. at 56.  Withal, the district court made its finding not on
summary judgment but after a bench trial.  See id. at 54-56.  The
opinion does not stand for the proposition that a court, at the
summary judgment stage, may accept uncritically an employer's
articulation of cronyism as an explanation for its actions.  
Rather, the court must take the next step and determine, on whole-
record review, if the evidence raises a genuine issue of material
fact as to whether the proffered explanation is the real reason for
the employer's decision or, conversely, a pretext for
discrimination.  See, e.g., Conward, 171 F.3d at 19; Mullin v.
Raytheon Co., 164 F.3d 696, 699 (1st Cir.), cert. denied, 120 S.
Ct. 44 (1999).
 At any rate, the district court's error goes well beyond
its failure to probe the facts surrounding Winters's enlistment.  
In the circumstances of this case, the court should have cast the
net of its inquiry more widely and assessed all the recalls and
hirings that had transpired during the months of December and
January.  See McDonnell Douglas, 411 U.S. at 804-05; Conward, 171
F.3d at 20.
 Costa Bros. seems to concede that, in the usual case,
this would be the proper focus.  Nevertheless, it maintains that
the appellants directed the lower court's attention to Piper and
Winters, and thus have waived the right to claim that the court
should have considered a broader array of hiring decisions.  We
examine this line of defense.
 In fairness, the appellants did place heavy emphasis on
the arrival of Piper and Winters.  Yet, we cannot say that they did
so to the exclusion of the broader comparative group.  The
appellants' complaint alleges, without limitation, that on three
dates in January 1996, "the defendant hired other outside white
employees for the mason positions previously held by plaintiffs."  
The appellants followed up on this averment in the course of
pretrial discovery; they sought the race and national origin of all
employees who were (a) laid off on December 7, 1995, and (b) hired
(or rehired) thereafter.  When Costa Bros. moved for summary
judgment, the appellants' opposition noted that "[d]efendant also
admits that numerous employees [who] were white and/or Portuguese
were hired at the project as masons," thus conceptualizing the
comparative group as comprising more than merely Piper and Winters.  
They also assailed the employer's contention that DaCosta had hired
his "own men," positing that this was not a legitimate,
nondiscriminatory reason for failing to recall the appellants
because this group included no minorities.  Finally, at oral
argument on the summary judgment motion, the appellants' counsel
attempted to focus the court on the issue of pretext, urging that
the "regular crew" and "special skills" explanations "weren't the
reasons that [DaCosta] wasn't hiring minorities"; that "when [Rose]
went back to this site the place was full . . . and none of the
faces that he saw on the job site when he returned there were any
employees he had seen previously"; and that "the reasons given [by
DaCosta] were false . . . . the whole place was re-employed and
[Piper and Winters] weren't the only [new] people."
 In sum, the appellants persistently attempted to refer
the district court to a larger comparative group.  The court, just
as persistently, refused to countenance such a comparison.  Waivers
are not lightly to be inferred, and in these circumstances, we are
reluctant to deprive the appellants of their day in court.  
Although the question is not free from doubt, we conclude that the
appellants adequately preserved the argument that the proper
comparative group consists of all workers recalled or hired during
December and January.
 We turn to this comparison.  Costa Bros. tries valiantly
to head off a detailed inquiry by insisting that, in the relevant
period, it hired only persons who had been part of its regular
complement.  Without more, this professed policy cannot justify the
entry of summary judgment.  Indeed, such a praxis   in DaCosta's
phrase, the exclusionary use of "my own men"   cuts both ways.  
Common sense teaches that when a work force is lily white (or
nearly so), practices that have the effect of excluding outsiders
may serve to discriminate against minorities in a devastatingly
effective manner.  Accordingly, the very existence of such a policy
sometimes constitutes evidence of discrimination.  See, e.g., EEOC
v. Steamship Clerks Union, Local 1066, 48 F.3d 594, 606 (1st Cir.
1995); Thomas v. Washington County Sch. Bd., 915 F.2d 922, 925 (4th
Cir. 1990).  Given the contradictions and ambiguities that permeate
this record, the question of whether DaCosta's stated preference
for hiring "my own men" is a pretext for racial discrimination is
for the factfinder at trial, not for the judge on a Rule 56 motion.
 Costa Bros. also presses a "same actor" argument.  See
LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993).  It
observes that Ceribelli hired Rose and Gilbert on the basis of
friendship and suggests that declining to rehire them based on
racial animus makes no sense.  But it was DaCosta, not Ceribelli,
who rebuffed Rose and Gilbert when they applied for reinstatement.  
A jury rationally could conclude, therefore, that, in Ceribelli's
own words, he had "only hired a few minorities because of local
pressure," and that DaCosta   who owned the company   precluded any
further minority hiring once that pressure subsided.
 Having cut a passable swath through the tangle of
arguments advanced by the employer, we now focus on the adequacy of
the appellants' proof of pretext cum animus.  We previously
concluded that DaCosta's statements that (1) "I don't need
minorities, and I don't need residents on this job.  I got my men,"
and (2) "I don't have to hire you locals or Cape Verdean people"
were amenable to differing interpretations, one benign and one
discriminatory.  See supra Part III(B).  Although this ambiguity
defeated the attempt to characterize the statements as direct
evidence (and thus defeated the claim that the lower court erred in
refusing to engage in a mixed-motive analysis), see id., the
question differs under pretext analysis.
 In that mode, an inquiring court does not ask whether the
plaintiff has adduced direct evidence of discrimination, but asks
instead whether the evidence presented, regardless of its
character, suffices to raise a genuine issue about the
pretextuality of the employer's explanation for the challenged
employment decision.  In the course of this latter exercise, the
court, at the summary judgment stage, must interpret the evidence
in the light most flattering to the nonmovant, resolving all
ambiguities in that party's favor.  See Conward, 171 F.3d at 18;
Pagano, 983 F.2d at 347.  Thus, the fact that DaCosta's comments
were susceptible to conflicting interpretations helps the
appellants at this juncture.
 To all intents and purposes, that ends the matter.  The
evidence that we recounted in connection with the appellants' prima
facie case suffices to put the question of pretext into issue, and
DaCosta's statements, taken in the light most favorable to the
appellants, add the necessary element of racial animus.  See  
Hodgens v. General Dynamics Corp., 144 F.3d 151, 171 (1st Cir.
1998)(citing cases).  In other words, there is room on this record
for a rational factfinder to infer that Costa Bros.'s failure to
recall the appellants was motivated by a proscribed racial animus
rather than by random availability of workers or loyalty to members
of its regular crew.
 If more were needed   and we doubt that it is   the
record is replete with other evidence that points to the same
conclusion.  For instance, Ceribelli, when asked why minority
workers had not been recalled, responded that Costa Bros. "had only
hired a few minorities because of local pressure."  In the same
vein, DaCosta's repeated allusions to "you guys" and terms of like
tenor reinforce the inference of racial animus.  Then, too, the
circumstances surrounding Fernandes's abortive return to work lend
further support.
 We glean another relevant item of proof from George
Medeiros's affidavit.  Medeiros, a white mason, had been laid off
along with the appellants on December 7.  Later that month, he
inquired about reinstatement.  According to Medeiros:
   Mr. Ceribelli told me to call Domingos DaCosta
 at the company office, and inform him that I
 am looking for work as a bricklayer and mason,
 and specifically inform him that I am a
 Mashpee resident and am white.  I did what Mr.
 Ceribelli asked me to, and the next day
 [December 15] was hired to work on the Mashpee
 High School Project.

(Emphasis supplied.)
Although the appellants do not choose to catalog this statement as
direct evidence of racial discrimination   a choice on which we
take no view   we believe that it speaks volumes in a pretext
analysis.  We realize that a factfinder will have to pass upon
Medeiros's credibility, but that is precisely the point.  The
evidence, taken as a whole, creates a genuine issue of material
fact as to whether Costa Bros.'s explanations are canards, designed
to mask a discriminatory animus.
                    D.  The State-Law Claim.
 We need not separately discuss the merits of the
appellants' state-law claim.  The McDonnell Douglas framework
applies to disparate treatment claims brought under Chapter 151B,
but the appellants' burden is somewhat lighter in one respect.  
"While federal law requires a showing of pretext plus [racial]
animus, the Massachusetts courts appear, at the third step of the
pavane, to require a claimant to show only pretext."  Mullin, 164
F.3d at 699 (citing Blare v. Husky Injection Molding Sys. Boston,
Inc., 646 N.E.2d 111, 116-17 (Mass. 1995)).  We already have
concluded that genuine issues of material fact exist as to whether
Costa Bros.'s stated reasons for its actions are a pretext for
discrimination.  See supra Part III(C).  A fortiori, we must reach
the same conclusion with respect to the appellants' state-law
claim.  See Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26-27
(1st Cir. 1998).
IV.  CONCLUSION
 We need go no further.  In the circumstances of this
case, sufficient evidence exists to permit a rational finder of
fact to infer that the employer's articulated reasons for not
rehiring the appellants are merely a coverup for racial
discrimination.  Consequently, we vacate the order granting summary
judgment and remand for further proceedings consistent herewith.

Vacated and remanded.  Costs to appellants.

</body>

</html>